### EASTERN TERMINAL LUMBER CO. v. STITZINGER et al.

Circuit Court of Appeals, Third Circuit.
October 3, 1929.

No. 4000.

334

Stephen Stone, of Pittsburgh, Pa., Gil-Stephen Stone, of Pittsburgh, Pa., Gil-
fillan & Patterson, of New Castle, Pa., and
Stone, Chalfant & McCandless, of Pitts-
burgh, Pa., for appellants.

Frederic W. Miller and Zehner & Allen,
all of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, WOOLLEY,
and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an ap-
peal from a judgment of the District Court
entered upon a directed verdict for $20,422.-
21 for lumber sold and delivered to the de-
fendants.

The Eastern Terminal Lumber Company,
hereinafter called the lumber company, is a
corporation organized and existing under the
laws of the state of Washington, and is reg-
istered under the laws of the state of Dela-
ware. It is engaged in the lumber business
in the state of Washington and the West gen-
erally. The purpose of the registration in
Delaware was to have a point of delivery in
the East for its western fir and hemlock lum-
ber, which was shipped through the Panama
Canal and up the Eastern Coast to its lumber
yard in Wilmington, Del. The firm of Stitz-
inger & Co., composed of a father and two
sons, defendants herein, has been in the
wholesale lumber business for many years. It
entered into a contract on June 16, 1926, with
the lumber company whereby it became the
selling agent for the lumber company in cer-
tain designated portions of Pennsylvania,
Maryland, West Virginia, and Ohio. This
territory was later extended so as to include
a portion of the state of New York.

The contract was to exist, defendants say,
for a period of ten years, though this is dis-
puted by the plaintiff, and they were to re-
ceive a commission on sales of lumber of $2\frac{1}{2}$
per cent. on sizes from 2x4 to 2x12 and 3 per
cent. on sizes of 3x4 and larger. The con-
tract was exclusive, defendant contends,
though this too is denied by plaintiff, with the
exception that two or three retail yards were
to be permitted to buy direct from the lum-
ber company for their own needs, and with
the further exception that the lumber compa-
ny might retain a salesman by the name of C.
C. Grunder in its employ in the territory cov-
ered by the contract, with the proviso that, if
he ceased to be in the employ of the lumber
company, no successor to him should be ap-
pointed. Stitzinger & Co. was to purchase
capital stock of the lumber company to the
extent of from $15,000 to $25,000 at par of
$100 per share. It carried out this part of
the contract, and subscribed and paid for 150
shares, amounting to $15,000. It was also to
have at least four salesmen to canvass the dis-
trict regularly, develop business, advertise,
push the sale of lumber, and guarantee all ac-
counts. There were many other things in the
contract of minor importance which are not
material here.

The contract was oral, and became effec-
tive June 16, 1926. The defendants contend
that they faithfully performed all the duties
imposed upon them by the contract, and
charge that, after a few months, the lumber
company failed to keep on hand the sizes,
quantities, and quality of lumber necessary
to fill their orders and fix the prices so that
they might compete with others who sold
"similar kinds and grades of lumber" in their
territory; that the personnel of the officers

of the lumber company was changed, and finally these new officers canceled the contract on April 1, 1927.

Thereafter a number of orders, pursuant to the solicitation made by their agents before the contract was canceled, were sent in to them, and they forwarded them to the lumber company, which in turn shipped the lumber to the defendants so that they could fill the orders. They did not pay for these orders or some of them, and the lumber company brought this suit to recover the amount it claimed to be due on these orders. There was no dispute as to the amount due except in a few minor details which are immaterial here.

The defendants charge the lumber company with breaching the contract, and set up a counterclaim for damages growing out of the breach, and demand $53,055.57, with interest from April 1, 1927, when the contract was canceled, which was made up as follows:

(1) $15,000 paid for the 150 shares of stock in the lumber company which it agreed to surrender to the Company.

(2) $985 paid by the defendants for advertising in the district.

(3) $2,367.65 commissions due them on lumber sold by the lumber company in violation of the contract.

(4) $34,702.92, which represents commissions of $20.51 per car on 1,692 cars.

On this sum of $53,055.57 the defendants allowed a credit of $22,925.84, which it admitted to be due the lumber company for the lumber shipped to it on orders that came in after the contract was canceled. This left a balance of $30,129.73, with interest from April 1, 1927, which the defendants demand on their counterclaim.

In support of this claim they submitted evidence showing or tending to show that they paid $15,000 for the stock, $985 paid for advertising, the commissions claimed on lumber sold by plaintiff in violation of the contract, the commissions lost on the 1,692 car loads of lumber, the business which they had done during the ten months they had operated under the contract, and that no agent preceded or succeeded them in the territory in question.

The court declined to submit the case to the jury on the grounds that there was no evidence from which it could make any computation of damages and that the effort of the defendants to recover the $15,000 paid for the 150 shares of stock of the plaintiff company was in the nature of an equitable action to rescind the contract for the purchase of the stock, which could not be done in a court of law.

The defendants contend that the evidence was sufficient to support their claim for damages for loss of profits and that the purchase price of the stock may be recovered in an action at law for damages.

The making, the duration, exclusive character, and the breach of the contract were questions for the jury, and, if it had found these in favor of the defendants, the question of damages for the breach and the amount thereof were for the jury also, provided the defendants submitted evidence sufficient for it to pass upon. The damages which the defendants claim consist principally of two items: (1) Anticipated profits; and (2) damages which they suffered on account of the stock which they were required to purchase.

As to the profits which the defendants would or might have made had the plaintiff not canceled the contract, they cannot be estimated with absolute certainty, for there was no agent in the territory in question before the contract was made, nor was there one after it was canceled. The defendants therefore, had to depend upon the profits which they made during the existence of the contract as a basis upon which to calculate the profits which they would have made had the contract not been canceled. The law does not require absolute certainty or mathematical exactness. It is not so blind to justice as not to require the party causing the injury to respond in damages, if there is any reasonable method for their ascertainment. In the nature of the case, the amount of profits is uncertain. If, however, it reasonably appears that profits would have been made, had the terms of the contract been observed, and that their loss necessarily followed its breach, they may be recovered as damages, if the evidence is sufficiently certain and definite as to warrant a jury in estimating their extent. But the uncertainty which prevents recovery of profits is not uncertainty as to *amount* of profits which would have been derived from performing the contract but uncertainty as to whether any profits would have been derived therefrom. All that is required is reasonable certainty so that damages may not be based upon speculation and conjecture. L. R. A. 1916B, p. 872; Hendler v. Quigley, 38 Pa. Super. Ct. 39; Stewart v. Turner, 72 Pa. Super. Ct. 235; Stevenson v. Smith, 82 Pa. Super. Ct. 539; Wilson v. Wernwag, 217 Pa. 82, 66 A. 242, 10 Ann. Cas. 649; Macan v. Scandinavia Belting Co., 264 Pa. 384, 107 A. 750, 5 A. L. R. 1502; Osterling v. Frick et al., 284 Pa. 397, 131 A. 250.

As above stated, the profits which the defendants made during the ten months they were permitted to sell under their contract, were stated and were certain and definite, but there was no agent in the territory either before or after them, and so no evidence is available from which it can be determined with absolute certainty what the profits for the remainder of the contract period would have been. Does this fact bring the case outside of the rule requiring data of reasonable, but not mathematical or absolute, certainty? Prospective profits are always attended with more or less uncertainty, and the determination of future profits from past profits may in some cases operate injuriously and unjustly, but the refusal to apply this rule in any case would often violate that natural justice upon which the recovery of damages for wrongs is grounded. "Substantial justice is better than exact injustice." Osterling v. Frick et al., 284 Pa. 397, 131 A. 250, 252. "Absolute certainty, in cases of this sort, is unattainable. All that we can arrive at, is, by an approximation thereto." Rogers v. Insurance Co., 1 Story, 603, Fed. Cas. No. 12,016; Schumaker v. Heinemann et al., 99 Wis. 251, 74 N. W. 785; Cranmer v. Kohn et al., 7 S. D. 247, 64 N. W. 125. Many cases hold that the profits made before and after the discharge of an agent or the cancellation of a contract are data on which damages may be based. This case is practically sui generis, in that there was no agent for this territory either before or after the defendants. The question arises: May a person injure another by discharging him in violation of his contract and then escape the consequences of the injury by refusing to appoint a successor without showing that there was such a change in the business conditions and circumstances in the territory for the period of the contract as to render a reasonable estimation of the damages impossible? This is not shifting the burden to the defendant, for established facts and circumstances in general presumptively remain the same until the contrary is shown. ▮ We think the profits made by the defendants month by month while the contract was in force without change in the conditions under which they operated is evidence in this case on which substantial, but perhaps not exact, damages may be based and substantial justice rendered. Pittsburgh Gauge Co. v. Ashton Valve Co., 184 Pa. 36, 39 A. 223; Singer Manufacturing Co. v. Christian, 211 Pa. 534, 60 A. 1087; Wilson v. Wernwag, 217 Pa. 82, 66 A. 242, 10 Ann. Cas. 649; Hillsdale Coal & Coke Co. v. Pennsylvania Railroad Co., 229 Pa. 61, 78 A. 28, 140 Am.

St. Rep. 700; Macan v. Scandinavia Belting Co., 264 Pa. 384, 107 A. 750, 5 A. L. R. 1502.

The defendants allege that part of the contract was that they were to purchase from 150 to 250 shares of the capital stock of the lumber company at par of $100, and that they carried out their part of the agreement by purchasing 150 shares and paying the lumber company $15,000 therefor on July 10, 1926, with the understanding and condition that they were to have an exclusive agency in the territory in question for ten years, and that the $15,000 which they paid for the stock was an element of damage which they suffered on account of the cancellation of the contract.

▮ The learned trial judge did not take this view of the case, but raised the point at the trial, and held that the action of the defendants to recover this $15,000 was in the nature of an equitable action to rescind the contract for the purchase of the stock, and, while equitable defenses may be set up in actions at law and affirmative relief prayed for thereunder, yet, as no application had been made by the defendants to continue the jury case and to determine the equitable issue, it was then too late to do so, and the equitable defense was not available to the defendants in the law trial.

The defendants contend that as the purchase of the stock with the payment of the $15,000 was part of their contract, when the contract was canceled by the plaintiff, it was canceled as a whole, including the purchase of the stock, and it was thereafter entirely unnecessary to file a bill in equity to cancel a contract which had already been canceled. In other words, they accept the cancellation of the entire contract by the plaintiff and demand damages therefor.

▮ They ask damages for the $15,000 which they were required to spend as an item in the contract and offer to surrender the stock. What that damage is, if any, is a question for the jury under proper instructions of the court. When one party enters upon the performance of a contract and is prevented from so doing without fault on his part, one distinct item of damage is his outlay and expenses less the value of the materials on hand, and it does not lie in the mouth of the party who has wrongfully put an end to the contract to say that the other has not been damaged, at least to the amount of what he has been induced fairly and in good faith to lay out and expend, after making allowance for the material on hand. The outlay for this stock was made in good faith, without which the contract would not have been made. It is

now in the nature of so much material in the hands of the defendants. What the value is should be decided by the jury in resolving the question of damages. United States v. Behan, 110 U. S. 338, 345, 4 S. Ct. 81, 28 L. Ed. 168; Press Publishing Co. v. Reading News Agency, 44 Pa. Super. Ct. 428.

In refusing to submit the questions of damage to the jury, the learned District Judge fell into error, and the judgment is reversed and a new trial granted.