STENTOR ELECTRIC MFG. CO., Inc., v. KLAXON CO.

No. 7398.

Circuit Court of Appeals, Third Circuit.

Oct. 24, 1940.

Rehearing Denied Nov. 15, 1940.

James D. Carpenter, of Jersey City, N. J. (Henry M. Hogan and Robert H. Spreen, both of New York City, and Kevin McInerney, of Rochester, N. Y., of counsel), for appellant.

Paul Leahy and Southerland, Berl, Potter & Leahy, all of Wilmington, Del. (Murray C. Bernays and Abraham Friedman, both of New York City, of counsel), for appellee.

Before MARIS, JONES, and GOODRICH, Circuit Judges.

GOODRICH, Circuit Judge.

This is defendant's appeal from judgment in favor of the plaintiff for $160,-821.92, entered in the United States District Court for the District of Delaware. The jury returned a verdict for $100,000 and the trial judge thereafter granted the plaintiff's motion to add interest of $60,-821.92 to the judgment. The action was brought for breach of a contract under seal entered into on May 20, 1918 in New York. By the contract the plaintiff (Stentor) transferred to the defendant (Klaxon) all of its assets and its entire business as a going concern. Included in the transfer were certain patents then owned by the plaintiff, questions concerning which are the core of this litigation.

At the outset defendant raises the point that this plaintiff has no capacity to sue. The point was raised below by a plea in abatement to which a demurrer was sustained. Stentor Electric Mfg. Co. v. Klaxon Co., D.C.Del.1938, 23 F.Supp. 351. The defendant's contention arises out of the fact that on May 26, 1919, subsequent to the making of the contract already referred to, the plaintiff, a New York corporation, filed a certificate of voluntary dissolution. The defendant contends that such voluntary dissolution marks the death· of the plaintiff as a corporate body, that rigor mortis has long since set in and that there is, therefore, no plaintiff to conduct the action. The New York statute, however, must be examined before this question can be answered. At the time the voluntary petition of dissolution was filed the New York statute provided with respect to such dissolution of a New York corporation, General Corporation Law, Consol. Laws, c. 23, Laws of 1909, Ch. 28, § 221 (3): "Said corporation shall nevertheless continue in existence for the purpose of paying, satisfying and discharging any existing debts or obligations, collecting and distributing its assets and doing all other acts required in order to adjust and wind up its business and affairs, and may sue and be sued for the purpose of enforcing such debts or obligations, until its business and affairs are fully adjusted and wound up."

The defendant contends that this provision limits the right to sue to claims which have ripened into causes of action at the time of the dissolution. None of the New York decisions cited by either side construes the statute on this point and we have been unable to find any. But in the absence of authoritative decisions limiting them, the words of the statute seem clear. Existence is continued for "suing and being sued for the purpose of enforcing such debts or obligations." That an existing contract is an obligation seems too certain a proposition to require extensive argument or marshaling of authorities to prove it. A contract is a promise or set of promises for the breach of which the law gives a remedy or the performance of which the law in some way recognizes as a duty.

Restatement, Contracts § 1. That the defendant, by its contract, came under obligation to the plaintiff is plain. If it did not perform the plaintiff could sue for the breach of the obligation under the clear words of the statute, even though it had voluntarily dissolved. Compare City of Philadelphia v. Lieberman, 3 Cir., 1940, 112 F.2d 424, 428. Under the New York statute the figure of speech analogy is not death of the corporation, but its retirement from active business.

■ The defendant also says that after the plaintiff corporation was dissolved, there being no plaintiff, there could be no diversity of citizenship. This is the same point as that above stated in a somewhat different way. If the corporation, under the New York law, was sufficiently alive to sue, as we hold it was, the requisite diversity of citizenship existed. The parties were proper and there was a controversy.

We pass, therefore, to the substance of the case. The contract of May 20, 1918, concerns a transfer of the plaintiff's tangible assets and good will and the assignment of existing contracts to the defendant. Included in the transaction were certain patents then owned by the plaintiff. Two of these patents, which had been issued to Jesse L. Spence, vice president of the plaintiff, on September 29, 1914, are the important ones in this controversy. The clause transferring them reads as follows:

"Article Second: The Stentor Company further agrees to grant and hereby does grant, license and transfer to the Klaxon Company for the term of this agreement, but subject to its conditions, the sole and exclusive right to make, have made, use and sell telephone and related apparatus and devices and articles made in accordance with the United States Letters Patent, and applications for patents described on Schedule 'A' hereto annexed, or any subsequent improvements thereon which may be made, acquired, owned or controlled by the said Stentor Company upon the inventions or any of them, described in said Letters Patent or applications.

"The Stentor Company further agrees that it will grant a similar license to manufacture the said inventions, improvements and devices under any patent which has been or which may be issued to it by any foreign state or country."

These patents were for a telephone transmitter and receiver.[1] On its part the defendant paid approximately $130,000 to the plaintiff and agreed to pay the plaintiff 50% of the net profits realized from the sale of the articles manufactured and sold under the patents, unless the profits were less than 30% of the cost of manufacture, in which case an alternative division of the profits was to be made. The contract was to run until September 29, 1931, the date of the expiration of the Spence patents.

■ The defendant makes the argument that the contract was one for royalties based on profits only and that it was not within the contemplation of the parties that damages should be recovered from the

[1] The specification of Patent No. 1,112,-167 covering the transmitter describes the invention as follows:

"The proper position of the diaphragm is preserved by two delicate annular air cushions 17 and 18, preferably of thin rubber, which make light contact with the edge of the diaphragm and act merely to support the same when not in use. I have found that cushions so used serve as an aperiodic mounting, permitting the rigid diaphragm to move without flexure in accordance with the form of the impressed acoustic wave.

"In certain forms of apparatus hitherto used, air cushions have been employed to clamp a diaphragm firmly in place, for damping purposes. Such a structure has no relation to the present invention, wherein a substantially rigid diaphragm is so mounted as to acquire a movement of translation as a whole."

Following is a description from the specification of Patent No. 1,112,392 covering the receiver of the invention which it discloses:

"It will be seen that my improved receiver comprises a diaphragm, mounting-cushions and magnet so constructed and proportioned, as to magnet strength, diaphragm thickness and delicacy of air cushion mounting, that the diaphragm has a practically aperiodic action under the expected conditions of use.

"I have found that, where a relatively rigid diaphragm is lightly enough confined against a pneumatic cushion at its edge, this cushion exerts an aperiodic resilience, which leaves the diaphragm free to conform its movements as a whole to the particular vibrations which correspond to the magnetic changes in the telephone receiver. Such a cushion acts merely to hold up the diaphragm when current is cut off, and to preserve its proper angular position with respect to the magnet at all times."

defendant for failure to manufacture and sell articles made under the patents. But the express words of the contract do not permit such an interpretation of the bargain between the parties. In Article Thirteenth of the contract the defendant agreed that it "will use its best efforts to further the manufacture and sale of the articles covered by this agreement, and to that end it will maintain an efficient organization for the manufacture and sale of said articles". These are certainly broad words of unequivocal promise and we find nothing in other paragraphs of the agreement to modify them.

■ The case presents a number of problems in the conflict of laws which will be noted and dealt with at the appropriate places. The first relates to the law governing the obligation of a contract. The agreement was negotiated, executed and delivered by the parties in New York. The contract is, therefore, governed by the law of that State. While the question of the law determining the validity and scope of the obligation of a contract is the subject of considerable confusion in the authorities there is nothing in this case to create difficulty on that point. Reference to the place of contracting is the rule expressed in the Restatement of Conflict of Laws, § 332. This case presents none of the factors which, when present, lead courts to depart from that general rule. There is nothing here to show intention of the parties that any other rule should govern. New York is the place where plaintiff company was located and did its business. New York is the place where the agreement was both negotiated and consummated. New York law governs the obligation of the contract.

■ This brings us to the consideration of the defendant's next argument. He contends that the articles covered by the patents had no commercial utility, that the District Court erred in holding that the contract was a license rather than an assignment and instructing the jury that the defendant could not question the validity of the patents. These points involve, in our judgment, the same general proposition and will be treated together, for both go to the proposition whether the defendant was in default in failing to use its best efforts in the manufacture and sale of the articles covered by the agreement.

The court below instructed the jury that it was necessary that it should find that the patents possessed commercial value and utility sufficient to justify the manufacture and sale of devices thereunder in order that the plaintiff should recover By its verdict the jury resolved this question in favor of the plaintiff. There was evidence upon which the jury could base that finding. It was not disputed that all the receivers and transmitters sold by the defendant were stamped with the words "patented" and "Stentor" and that the plaintiff paid royalties to the defendant on the sale of these devices. There was introduced in evidence advertising matter distributed by the defendant showing that the articles were manufactured under the Spence patents and that the equipment was of "surpassing merit, combining utility, comfort and safety." There was a letter to Mr. Spence from one of the defendant's officers praising the equipment. There was an exchange of communications between officers of the defendant in which it was suggested that since only a small part of the construction of the devices then being manufactured came under the Spence patents, the possibility of changing the construction to avoid the patents entirely should be considered. There was oral testimony introduced as to the value of the receiver patent in radio apparatus. The defendant points to evidence tending to prove that its devices were not manufactured in accordance with the Spence patents and that the teachings of these patents were commercially useless. No good end would be served by reviewing all of the testimony. It is sufficient to say that the fact problems here were for the consideration of the jury and there was ample evidence to support its finding.

■ Both parties have argued at length the question whether the contract between them was a license to manufacture under the patents or an assignment of the patent rights. It is true that under the law of New York a vendee of a patent may defend a suit for the price on the ground that invalidity of a patent constitutes failure of consideration, whereas a licensee may not question its validity. Marston v. Swett, 1876, 66 N.Y. 206, 212, 23 Am.Rep. 43; Herzog v. Heyman, 1897, 151 N.Y. 587, 45 N.E. 1127, 56 Am.St.Rep. 646. The defendant's argument that it is an assignee rather than a licensee is evidently the meeting of the condition precedent to

allowing it to show that the consideration for the agreement failed.

█ It is not necessary for the determination of this case to decide whether the defendant was an assignee or a licensee. There was no failure of consideration. The defendant got exactly the monopoly for which it bargained. It carried on its business under these patents throughout the term and accepted such benefits thereunder as it thought desirable to reap. Although at times the defendant questioned whether some of the articles it manufactured came within the scope of the patents it never raised the question of their validity. Having accepted all the benefits which the contract provided should accrue to it the defendant may not now excuse its failure to perform by alleging it did not receive what it bargained for. The terms of the contract gave the sole right to manufacture the articles under the patent to the defendant. It enjoyed the monopoly it bargained for and there was no failure of consideration.

There appears to be no New York case directly in point. Marston v. Swett, supra, specifically left the question open, but the decision of the United States Supreme Court in Kinsman v. Parkhurst, 1855, 18 How. 289, 15 L.Ed. 385, bears directly on the problem. In that case the owner of a patent assigned a one-third interest therein, the assignor and assignee agreeing to carry on the business of manufacturing and selling the patented machine. Thereafter the parties agreed that the assignee should continue the manufacture of the machines only until he had reimbursed himself for various expenditures, after which time the manufacture was to be carried on solely by the assignor who was to pay the assignee one third of the net profits. Alleging that the assignee, in violation of this agreement, had continued to manufacture after reimbursement, the assignor brought suit for an accounting.

The defense that the patent was invalid was held to be unavailable. The court stated (18 How. page 293, 15 L.Ed. 385): "Having actually received profits from *sales of the patented machine*, which profits the defendants do not show have been or are in any way liable to be affected by the invalidity of the patent, *its validity is immaterial*. Moreover, we think the defendants are estopped from alleging that in-

validity. They have made and sold these machines under the complainant's title and for his account; and they can no more be allowed to deny that title and retain the profits to their own use, than an agent, who has collected a debt for his principal, can insist on keeping the money, upon an allegation that the debt was not justly due."

To the same effect see Milligan v. Lalance & Grosjean Manuf'g Co., C.C.,S.D., N.Y.1884, 21 F. 570; 2 Walker on Patents (Deller's Ed. 1937) § 350.

### Damages.

█ Defendant complains of the admission of evidence on the question of damages, and maintains furthermore, that the damages were entirely too speculative and that the verdict should have been limited to a nominal sum. It has been pointed out that damages were sought for the failure of defendant to "use its best efforts to further the manufacture and sale of the articles covered by" the contract between the parties. It is always difficult in such a case to translate the wrong into terms of mathematical exactness. Two basic principles must be balanced against each other. The reconciliation must be made between the principle that the plaintiff is entitled to compensation even though there is some uncertainty with respect to the amount, and the principle that the jury must be furnished with reasonable guides by which to reach a verdict and will not be allowed to make an uncontrolled guess.[2] On the general point it is said in the Restatement, Contracts § 331, Comment a: "The requirement of reasonable certainty does not mean that the plaintiff can recover nothing unless he establishes the total amount of his harm; nor does it mean that he cannot get damages unless he proves the exact amount of his harm. The requirement merely excludes those elements of harm that cannot be evaluated with a reasonable degree of certainty. * * * Furthermore, there are cases in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, while at the same time it is of such a character that the amount in money is incapable of proof. In these cases the defendant usually has reason to foresee this difficulty of proof and should not be allowed to profit by it. In such

---

[2] Williston on Contracts (Rev.Ed.1937) § 1345; McCormick on Damages (1935) §§ 26, 27.

cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court."

Again in the Restatement, Torts § 912, Comment d, on the subject of an injury to a business, it is stated: "Although in such cases, the burden is on the injured person to prove with a fair degree of certainty that the business or transaction was or would have been profitable, it is not fatal to the recovery of substantial damages that he is unable to prove with definiteness the amount of the profits he would have made or the amount of harm which the defendant has caused. It is only essential that he present such evidence as might reasonably be expected to be available under the circumstances (see Illustrations 11 and 12)."

The defendant's objections to the proof of damages may now be considered in the light of these general principles.

 The defendant objects to the admission of certain testimony on the part of the president of the plaintiff company, Mr. Hollister. Mr. Hollister made an estimate of the additional profit which his company would have received had the defendant performed its part of the contract. Some of this evidence was pretty highly speculative. Nevertheless, the defendant is not in a position to complain of it for it was at the defendant's insistence that the question was opened. This being so, defendant cannot now object. McBoyle v. United States, 10 Cir., 1930, 43 F.2d 273, 275; Warren Live Stock Co. v. Farr, 8 Cir., 1905, 142 F. 116, 117; Wigmore on Evidence (2d Ed. 1940) § 15.

 Moreover, there is sufficient competent evidence in the record to justify the verdict. There was evidence that Stentor had made a net profit in 1917 of approximately $13,000, and that Klaxon had earned approximately $60,000 from May 20, 1918 to the end of that year, of which Stentor received half. During the fourteen year term of the agreement Stentor received from Klaxon about $70,000. The jury could properly compute damages by reference to the profits previously made by a going business.[3] The use of the profits for either year as a basis would result in a greater sum than $100,000. Defendant argues that those profits cannot be used as a criterion because they resulted from contracts with the Navy which business terminated with the close of the World War. But there was evidence that there was other private business available which Stentor could not handle because of its insufficient capitalization and that one motive for the agreement was that Klaxon could expand the operations so as to take advantage of such potential business.

There was evidence of damage suffered as a result of defendant's policy of selling to its affiliated companies at a very small margin of profit. Thus one letter dated July 27, 1926 reads in part as follows:

"Under the circumstances, I believe that inasmuch as we are actually showing a fairly good profit on this business and enough to pay the Stentor Company something on their contract that it would be advisable for us to reduce the price of the equipment to Fisher Body enough to bring the profit down to a point where it would not be necessary to pay any to this outside concern.

"Mr. Cooper has promised to investigate this matter and notify me just what reduction could be made on the Fisher Body business to bring it down to the point where we would only be making our own legitimate profit and not be obliged to pay any out to the Stentor Corporation."

Another letter dated December 19, 1929, states: "The occasion for some profit in this particular quarter was that we sold a small amount of equipment to some outside Companies. * * *" There was proof also of the total amount of business done in each year. Plaintiff's president, Hollister, was permitted to estimate the loss to Stentor during 1928, 1929 and 1930 as a result of this duplicity at $23,423.84.

It is true that there was no evidence on the record of the exact amount of the price differential or the number of units sold to affiliates at the favored price. But the evidence was clear on the fact that a wrong had been committed. And there was evidence on the record of the rate of profit on the sales to affiliates and of the rate of profit to outside concerns in earlier years. It was not unreasonable to draw the inference from the letter of December

---

[3] Eastern Terminal Lumber Co. v. Stitzinger, 3 Cir., 1929, 35 F.2d 333; Hedrick v. Perry, 10 Cir., 1939, 102 F.2d 802; Williston on Contracts (Rev.Ed. 1937) § 1346A.

19, 1929, that during the years in question (1928, 1929 and 1930) all sales were made to affiliates, with the exception of the quarter there m..ntioned, especially in view of the fact that no profits were paid to Stentor in those years. It is true that there was a great deal of uncertainty but we cannot say that the estimate was baseless. If the facts were otherwise they were peculiarly in the knowledge of the defendant, but defendant did not go into the question. The following quotation from the Supreme Court is appropriate:[4]

"It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. * * *

"Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. * * * As the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party."

### Addition of Interest.

 Judgment was entered upon the verdict of the jury for $100,000 on July 20, 1939. Upon motion of the plaintiff on July 26, 1939, the court added $60,821.92 to the judgment as interest computed at 6% from the date of the institution of the action to the date of the entry of the judgment. As pointed out by the court below the authority as to power to amend is found in Rules 54 (c) and 60 (a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.[5] The basis of this addition to the verdict is found in § 480 of the Civil Practice Act of New York. It provides: "In every action wherein any sum of money shall be awarded by verdict, report or decision upon a cause of action for the enforcement of or based upon breach of performance of a contract, express or implied, interest shall be recovered upon the principal sum whether theretofore liquidated or unliquidated and shall be added to and be a part of the total sum awarded." The correctness of this addition is strenuously attacked by the defendant. This question presents the most difficult point of the case. Is the New York statute applicable? No one disputes the general proposition that all matters of procedure are governed by the law of the forum; Restatement, Conflict of Laws § 585. But it is clear by what we think is undoubtedly the better view of the law that the rules for ascertaining the measure of damages are not a matter of procedure at all, but are matters of substance which should be settled by reference to the law of the appropriate state according to the type of case being tried in the forum. The measure of damages for breach of a contract is determined by the law of the place of performance; Restatement, Conflict of Laws § 413. With regard to the item of interest as damages for breach of a contract the Restatement of Conflict of Laws, § 418 says: "The rate of interest allowed as part of the damages for the breach of a contract is determined by the law of the

---

[4] Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 562, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544.

[5] Rule 54 (c):
" * * * every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

Rule 60 (a):
"Clerical mistakes in judgments, orders, or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party and after such notice, if any, as the court orders."

place of performance." See also Goodrich on Conflict of Laws (2d Ed. 1938) 215 and cases cited in note 101; 2 Beale, The Conflict of Laws (1935) 1335 and cases cited in note 6.

■ Where was the place of performance of this contract? It has been said above that the contract was entered into in the State of New York. The plaintiff performed its part there upon the execution of its document of transfer to the defendant. There was no express provision stating where performance by the defendant was to take place. Restatement, Conflict of Laws § 355 states as follows:

"Place of Performance.

"The place of performance is the state where, either by specific provision or by interpretation of the language of the promise, the promise is to be performed. Comment:

"a. The place of performance is often fixed by the contract. If the place of performance is not stated in specific words in the contract, it must be determined by construction and interpretation. A contract may be made up of several promises, each of which has its own place of performance which is different from that of the other promises."

We think the proper construction of this contract fixes New York as the place of performance. As stated, plaintiff performed its part in that State. The sale was that of a going business which was being carried on in New York, the location of the Stentor plant. The contract provided that the defendant was to carry on that business and the defendant did commence performance in New York, although later it moved its operations to other States. There is no other State where the contacts with this transaction are such as to indicate the propriety of reference to other law in determining this question. Furthermore, "In the absence of specific language, or of circumstances indicating a contrary intention, a contract is to be performed, in most cases, at the place of contracting, as has often been laid down in the cases." 2 Beale, The Conflict of Laws (1935) 1259.

■ Taking the New York law as the proper rule of reference to determine the question of damages and taking it further that the matter of recovery of interest and the rate thereof is a matter of substance, there is the further difficult question whether the New York statute above referred to is a matter of substance to be included as a proper part of the reference to New York law in this case, or whether it is simply a regulation of procedure in the New York courts. This question the court at the forum must determine.[6] We do not get help from previously decided cases upon this point. In Funkhouser v. J. B. Preston Co., 1933, 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243. The Supreme Court held that the retroactive application of the statute did not violate the obligation of a contract. Such a decision, obviously, does not settle the conflict of laws problem as to whether the statute should be interpreted merely as regulating the procedure in New York courts or whether it is part of the New York law to be included in reference by a court in another State. It seems to us that the statute, in the Conflict of Laws sense, at any rate, is substantive and that reference to it is rightfully included. It gives a plaintiff against whom a breach of contract has been committed a definite right to interest as an element of his damages. It seems as substantial an item as, for ex-

---

6 Restatement, Conflict of Laws § 584:

"Determination of Whether Question is One of Procedure.

"The court at the forum determines according to its own Conflict of Laws rule whether a given question is one of substance or procedure.

Comment:

"a. The rule stated in this Section is an application of the general principle that a court applies the Conflict of Laws rule of its own state (see § 7). The reference to the foreign law is not to its Conflict of Laws rules for settling foreign cases in that state (with rare exceptions, see § 8), but to its internal rules with reference to transactions similar to the one in question.

"b. In determining whether an element of a foreign transaction is one of substance or procedure, a court will examine the entire transaction which is before it. This includes the statute or other rule of law creating the alleged right or duty, and its interpretation thereof by the courts of that state. In determining the question, however, it is to be observed that in so far as the local rule of the forum is applied because the question is considered one of procedure (see § 585), the result of the litigation to the parties may be changed, and therefore that the reference to the foreign rules are limited only because of the paramount reasons of local convenience and policy (see Introductory Note to this Chapter)."

ample, loss of time in a personal injury case. We, therefore, conclude that the reference to the New York statute was correctly made by the trial court in adding the amount of the interest to the verdict.

Appellant maintains that the computation of interest from the date of commencement of the action, while in accord with the general New York practice where there is no proof of a fixed date of breach,[7] is not justified where the jury's verdict may include damages accruing after the date of institution of the action, but no New York decision is cited on the point. Clearly most of the damages accrued prior to the institution of the action yet plaintiff has interest only from that date. On these facts there is no injustice in computing interest from the date the action was started.

The judgment of the District Court is affirmed.

---

[7] Manufacturers Trust Co. v. Gray, 1938, 278 N.Y. 380, 16 N.E.2d 373; Aronowsky v. Goldberger-Raabin Co., Inc., 1937, 250 App.Div. 731, 293 N.Y.S. 527; Freedman v. Hart & Early Co., Inc., 1935, 162 Misc. 487, 293 N.Y.S. 525.