**SMITH et al.**
v.
**ONYX OIL & CHEMICAL CO.**
Civ. A. No. 1333.

United States District Court
D. Delaware.
April 2, 1954.

See also 106 F.Supp. 697.

Arthur G. Logan, of Logan, Marvel & Boggs, and Stephen E. Hamilton, Jr., Wilmington, Del., for plaintiffs.

Arthur G. Connolly and Januar D. Bove, Jr., of Connolly, Cooch & Bove, Wilmington, Del., for defendant.

LEAHY, Chief Judge.

1. This is an action for breach of contract. Plaintiffs seek damages for loss of profits and expenses incurred because of repudiation by defendant of the agreement.

Plaintiffs, Laurence C. Smith and Laura C. Smith, are partners trading as Laurence C. Smith Co. in Syracuse, New York. The firm has been for years engaged in distributing dry cleaning supplies and equipment to establishments, laundries, institutions, hospitals and laundermats.

Defendant Onyx is a Delaware corporation. It has been for 43 years engaged in the manufacture and sale of chemical products. It is a leading company in the manufacture of chemicals for use in the textile finishing business. Its gross sales in 1949 were approximately $3,000,000. In 1949, Onyx was not in the dry cleaning industry.

But in that year there was a need for a sizing product which dry cleaners

could use when they wet washed clothes to clean them. The evidence shows most fabrics have a finish added at the mill which often is removed when they are wet washed leaving a rather raggedy piece of goods, and, in order to make the fabric feel new again, sizing is used to put back into the fabric what it had in it before. This gives it drape and body.

At the suggestion of Fred G. Harris, who was with his brother Roy Harris in the dry cleaning business and also the chemical business in Cortland, New York, two representatives of Onyx called on plaintiff Smith in Syracuse, New York, in August of 1949, in an effort to get him to promote the sale in the dry cleaning field of two products manufactured by Onyx, which it was believed would supply the need for a sizing in the wet cleaning division of the dry cleaning industry. The two representatives of Onyx were Paul D. Jacobs and Stanley A. Trezise.

Smith agreed to arrange for a demonstration in Syracuse. In early September 1949, Jacobs and Trezise returned to Syracuse and demonstrations were conducted in three dry cleaning establishments in Syracuse with the two Onyx products. The two products were Resin 362 and Onyxsan HSB. The demonstrations consisted of mixing the two products after one had been heated and emersing garments which had been wet washed into the mixture. Demonstrations disclosed the mixture of the two products produced results. It became obvious in order to interest operators in the dry cleaning industry to use the mixture, it would be necessary to combine the two products into a single product and package it as a single product for sale. Smith requested Onyx to try to combine the two products into one so as to have a saleable product. Onyx promised Smith they would go back to their plant and "attempt to combine them (the two products) into a marketable product."

On September 9, 1949, Trezise wrote to Smith and said:

"Paul (Jacobs) is now at work on compatibility and dilutibility tests with a view toward making the best stock solution. We should have some results in the near future. It may be some time, however, discounting a degree of luck before we can find a suitable solvent soluble resin to complete the picture."

On September 21, 1949, Trezise wrote to Smith saying:

"I have your letter of September 14 and am offering my apology for not answering sooner but I have been anticipating the completion of Jacobs' work on the incorporation of the two products in one. We now have that work completed and have a stock solution of the two materials which consists of 16⅔% Resin 362, 16⅔% Onyxsan HSB and the balance water. This stock solution can be used in the ratio of 66:1 for actual application—or in more plain language, 1⅓ pounds to ten gallons of water."

Onyx worked on combining the two products into the new single product. Jacobs, who had created the formula for it, advised the manufacturing part of Onyx how to make the new product and package it. The combination of the two products into a single product was worked out in the Onyx plant after the second trip of Jacobs and Trezise to Syracuse in September. On October 11, Trezise advised Smith the new mixture was being forwarded, although refrigeration tests were still under way.

After a demonstration at the Harris plant, Jacobs and Trezise drove Smith from Cortland to Syracuse; they were all enthusiastic about the future of the new product. Jacobs was exuberant "because of a job well done". On the trip, the name Revitex was coined for the new product. It was agreed the name Revitex should be the property of Smith; Onyx would manufacture the new product, put Smith's labels on it and ship it to purchasers from Smith. The cost of the new product was calculated. Smith said he would not be interested unless he had an "exclusive" right to sell the new product and Trezise agreed to take that aspect of the matter up with Onyx.

On November 19, Smith wrote Onyx and added as a P. S., "How about drawing up some agreement on the exclusive distribution of this product?" Smith wanted a contract giving him exclusive rights with respect to Revitex in order to protect him and to aid him in making sales. He did not want to spend money on nationwide advertising, and promotional efforts without a written contract. Onyx understood this.

A meeting was arranged in the Onyx offices in Jersey City, on December 12, to negotiate a contract between Onyx and Smith for the distribution of Revitex by Smith. Smith and his lawyer, Lawson Barnes, went to the meeting. Onyx was represented by Victor H. Berman, who has been president and treasurer of Onyx for 43 years; Leon P. Brick, vice-president in charge of sales; Albert R. Jenny, vice-president and general sales manager; James H. Tully, an attorney who had represented Onyx for 40 years, and Jacobs and Trezise. When the meeting opened, Trezise made a statement of what had happened to that date and stated the meeting was being held to negotiate a contract. It was understood at the meeting Revitex was Smith's trade name and it consisted of a combination of Resin 362 and Onyxsan HSB, the two products of Onyx.

Prior to the meeting, Barnes (Smith's lawyer) drafted a proposal which Tully read to the meeting, clause by clause. Tully acted as Chairman of the meeting. Berman left the meeting but announced Tully would take things in hand and whatever Smith agreed upon with Tully would be perfectly acceptable to Onyx. At the meeting the parties reached an agreement on all important points and it was decided an agreement between Onyx and Smith should be put in writing and Tully was "empowered" and "commissioned" to prepare a second draft.

Tully did prepare a second draft which he mailed to Barnes on December 16. This second draft embodied all of the important points discussed and agreed upon at the meeting. It gave Smith exclusive rights; it provided for minimum sales; it specified the price, and provided terms. It left undecided the period of credit Smith was to get. In the letter transmitting this second draft to Barnes, Tully said:

"I am sending to you herewith a redraft of the proposed agreement between your client, Mr. Smith, and Onyx Oil & Chemical Co., which I ask you to kindly examine.

"As I see it, the contemplated arrangement between the parties is a simple one, which has for its primary purpose the manufacture and sale by Onyx to Mr. Smith of the Product Revitex at a stated price and the agreement upon the part of Onyx that it will not sell that product to dry cleaners, laundries and dyers serving the dry cleaning and laundry trade during the period of the contract, as long as Mr. Smith makes the minimum purchases after the first year. Correspondingly, Mr. Smith agrees to purchase exclusively from Onyx during the period of the agreement. The marketing of the product in the dry cleaning and laundry trade will be the business and should be the responsibility of Mr. Smith."

On December 20, Jenny, Onyx' sales manager, wrote Smith confirming the understanding reached at the meeting with respect to an area within which Onyx would ship to Smith's accounts without charging Smith for freight. Jenny said:

"As you will recall this matter was discussed after Mr. Tully left the meeting and therefore does not appear in the original draft of the contract."

On December 20, 1949, Barnes wrote Tully enclosing a third draft of the agreement. The third draft contained ten changes. The letter concludes:

"I am hopeful that the above changes will be agreeable to you and your client, and will appreciate further words from you as soon as possible."

On December 22, 1949, Tully wrote Barnes and acknowledged receipt of the

letter of December 20, together with the third draft. Tully stated:

"Your various changes have been submitted to our client for its approval and as soon as I hear from them, I shall be pleased to again communicate with you." Tully then discusses the question of insurance for the sale of Revitex.

On December 28, 1949, Tully again wrote Barnes. He stated:

"I have gone over with Onyx your redraft (third draft) of the proposed agreement between it and Laurence C. Smith Co., and it would appear that we are in general accord except for some minor changes which I suggest as follows: * * *."

On January 9, 1950, Barnes wrote Tully concerning the suggestions contained in Tully's letter of December 28. Barnes stated:

"The proposed agreement between Onyx Oil & Chemical Company and Laurence C. Smith Co. has been revised in accordance with the suggestions contained in your most recent letter.

"You will no doubt recall that the sale of the product by Smith to institutions was discussed at the Onyx plant and the same was agreeable to Onyx. Smith desires that such sales be covered in the agreement. * * *

* * * * * *

"To each copy of the agreement kindly attach and mark Schedule A, the map referred to in paragraph one.

"Four copies of the proposed agreement are enclosed. Mr. Smith will be at the Onyx plant sometime between tomorrow and Thursday and could execute the agreement on behalf of Smith while there * * *."

The four copies of the proposed agreement Barnes enclosed in his letter to Tully of January 9, 1950, consisted of four copies of his third draft which he had changed by interlineations embodying the changes suggested by Tully in his letter of December 28, 1949.

On January 11, 1950, Tully wrote Barnes and suggested that sales to insti-

tutions should be limited to non-Federal Government institutions. He said Jenny objected to sales to Federal Government institutions because:

"* * * He (Mr. Jenny) pointed out that the Quartermasters' Corps of the Army maintained laboratories where they analyzed all products and might very well purchase the ingredients of Revitex separately. * * *"

Tully then stated:

"Mr. Smith is expected at the Onyx plant tomorrow but because of the necessity of changing the agreement (re institutions), I shall refrain from having it executed by Mr. Smith and Onyx. When I hear from you, and after we have agreed upon the modification of the phrase covering institutions, I shall amend the agreement accordingly and have it executed by Onyx. Then I shall forward it to you for execution by Mr. Smith.

"In the meantime I am asking Mr. Jenny to prepare copies of the map to be known as Schedule 'A' ".

On January 12, 1950, Barnes wrote to Tully. He stated:

"Smith will agree to such limitation of the term 'institutions'. Kindly, therefore, amend the proposed agreement accordingly."

With the exchange of the January 11th and 12th letters between Tully and Barnes, the parties were in complete accord as to what the written contract should contain.

Tully prepared the fourth and final draft of the agreement and sent it to Barnes on January 18, 1950. In his letter transmitting the agreement to Barnes, he said:

"In accordance with your letter of the 12th instant, I have further amended the proposed agreement between Smith and Onyx to the extent of indicating in the second 'whereas' clause and in paragraph '2' that the institutional field does not include Federal Government institutions and the Army and Navy. As so corrected, *I am sending to you herewith*

*an original and one copy with the request that you kindly have the agreement executed on behalf of the Smith Company by Mr. Smith as partner and return the original to me.* I shall have a duplicate original of the agreement executed by Onyx and send it to you upon receipt of the original." (Emphasis supplied.)

Tully forgot to annex Schedule "A" to the agreement which he sent Barnes. This oversight was corrected by a letter from Tully to Barnes dated January 20, 1950:

"I neglected to annex to the agreement Schedule 'A' which is referred to in Article '1' of the agreement I sent to you for execution by your client. This was an oversight and due to the fact that Mr. Jenny had assumed the responsibility of preparing the Map and sending it to me. I spoke to him on the telephone just now and learned that he hopes to have it completed by the early part of the coming week. When it is completed I shall annex a copy to the agreement being executed by Onyx before I send the executed copy to you. I shall also obtain your approval of the copy before annexing it to the duplicate original."

On January 17, 1950, Smith had written to Brick, inquiring about the volume clause and whether he might develop the sale of Revitex in two other fields. Brick called Smith on January 19, 1950, to discuss Smith's letter and they came to an accord with respect to the questions raised by Smith. Whereupon, Smith agreed he would sign the final draft of the agreement which Tully had mailed to Barnes on January 18, 1950. Brick confirmed his telephone talk by a letter referring to " * * * the contract sent to Mr. Barnes by Mr. Tully *for your signature.*" (Emphasis supplied.) After the talk with Brick, Smith went to Barnes' office and on January 21st signed the agreement which Tully had put in final form and had requested Barnes to have Smith sign. The date, January 21st, was inserted in Barnes' office.

On January 21, 1950, Barnes wrote Tully and enclosed the signed original of the agreement executed by Smith. This was pursuant to the request of Tully in his letter to Barnes dated January 18, 1950. Barnes stated:

"As requested in your letter of January 18th, the original of the agreement between Onyx and Smith has been executed on behalf of Laurence C. Smith Co. by Laurence C. Smith, partner, and the same is enclosed.

"Kindly have the zone map, referred to in paragraph No. 1, marked 'Schedule A', attach the same to the agreement and return to me the duplicate original with said map attached and executed by Onyx."

The final agreement, prepared by Tully, which Smith signed, contained the same minimum provisions as the second draft prepared by Tully after the December 12 meeting. The minimum provisions only called for Smith to take, at the most, $72,000 worth of Revitex per year, which would have been a very small portion of Onyx's business.

On January 23, 1950, Daniel F. Cory, attorney for Harris, wrote Onyx claiming Harris was entitled to a royalty on all Revitex manufactured and sold because Cory claimed Revitex had been devised and worked out by Harris. On January 31, 1950, Tully wrote Barnes telling him of the Harris claim and stating Onyx would consider the matter terminated unless Smith satisfied Harris. From and after the Tully letter of January 31, 1950, Onyx repudiated and refused to recognize the final agreement, prepared by Tully and submitted to Barnes with the request Smith sign it; and which Smith had discussed with Brick and signed on January 21, 1950.

Although Onyx has refused to recognize the contract as being in existence and has refused to accord Smith exclusive rights, it has continued to sell. Revitex to Smith at all times. Onyx, in

fact, shipped a drum for Smith within a month prior to trial.

After Smith signed the January 21st agreement he went ahead promoting Revitex, taking orders and incurring advertising expenses. Onyx filled the orders. Smith continued pressing sales for about six months and then, after he realized he did not have an exclusive contract, he ceased promotional activities. During the period from November 1949, when Smith placed the first order, until July 1950, when he stopped promotional activities, he sold 470 gallons of Revitex. The orders were from approximately 80 to 90 of his customers and at the time he had 500 customers.

By virtue of the breach of contract, Smith suffered damages through loss of profits. Smith suffered damages through incurring expenses in connection with going forward with the agreement totalling $3,758.79.

2. The parties, I conclude, agreed in principle on terms of a contract in November, though there were details which had not been resolved. Smith started selling and Onyx started taking his orders in November. He was making progress in selling Revitex by December 1949. Absence of a written agreement was retarding his progress and he was unwilling to undertake nationwide promotional and advertising expense without protection.

As I stated, the parties reached an agreement on all important points and most minor ones at the December 12 meeting. Tully was "empowered" and "commissioned" to prepare an agreement. Efforts to complete a memorial of the agreement were intensified after the meeting. Tully and Barnes exchanged drafts. Smith had discussions with Jenny and Brick. All the provisions suggested by either Onyx or Tully were accepted by both parties and were

embodied in a final draft prepared by Tully and sent to Barnes on January 18, 1950, for Smith's signature.[1] Tully promised to have the duplicate original executed by Onyx and send it to Barnes upon receipt of the original. Berman and Brick knew Tully had sent Barnes the contract for Smith's signature. Smith executed the agreement and it was then sent to Tully.

At this point in time there was agreement on all terms of the contract and an intention to enter into a contractual relationship. This Court held in Canister Co. v. National Can Corp., D.C.Del., 63 F.Supp. 361, under such circumstances a contract exists.

Defendant seeks to avoid the contract because it did not come into existence and Jacobs, Trezise and Tully were not authorized to act for it in these negotiations.

Both these points are invalid.

■ Evidence shows Smith wanted a memorial of the agreement to protect him in selling the product. He was unwilling to undertake promotional and advertising expense without protection. Such purposes are unrelated to the question of the formation of a contract. Under such circumstances, contemplation of a written memorial, duly executed, does not prevent the formation of a contract. Restatement, Contracts, § 26; Disken v. Herter, 73 App.Div. 453, 77 N.Y.S. 300, affirmed 175 N.Y. 480, 67 N.E. 1081; Universal Products, Inc. v. Emerson, 6 W.W.Harr. 553, 36 Del. 553, 179 A. 387, 394, 100 A.L.R. 956. In the Disken case, the New York Court of Appeals said:

"Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not

---

1. The only exception is that Tully forgot to annex Schedule "A" to the agreement which was merely a map showing the area agreed upon in Jenny's letter of December 20 (PX 1–B–2). This oversight was corrected by a letter from Tully to Barnes dated January 20, 1950 (PX 1–J).

leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed."

The presence of Jacobs, Trezise and Tully and the acts which occurred at the meeting of December 12, 1949, show actual authority. Onyx' officers attended this meeting. They were told by Trezise what had happened up to date and thereby they adopted, by not repudiating, the acts of Jacobs and Trezise if such acts had not been previously authorized. And Onyx' officers "empowered" and "commissioned" Tully to prepare a memorial of the agreement. Brick knew Tully had prepared and sent the contract for Smith's signature. In the letter to Smith dated January 20, 1950, he referred to the "contract sent to Mr. Barnes by Mr. Tully for your signature". Since Onyx authorized and directed Tully to prepare a memorial and since it knew he had sent the memorial contained in his letter of January 18, Tully also had actual authority. It would be unlikely for an attorney to prepare and send a draft for signature without authority.

Jacobs, Trezise and Tully also had apparent authority. Their presence at the meeting would indicate they had authority to bind Onyx in the absence of a statement by the officers they did not have such authority. The officers knew and were told Smith had been dealing with Jacobs and Trezise and, as businessmen, must have known that Smith and Barnes would assume Tully was authorized to act for Onyx. An attorney can be an agent. Restatement, Agency, § 1.

3. Onyx seeks to avoid the effect of the contract by asserting it is unenforceable for non-compliance with the Statute of Frauds.[2] This defense has no merit.

The enforceability of the contract between Smith and Onyx is governed by New York law. The facts show it was Onyx who made the offer. Smith accepted the terms in New York; therefore, the contract is considered to have been made in New York. Restatement, Contracts, § 74. Since jurisdiction in this case is based on diversity, the applicable law, including the conflict of law rule, is the law of Delaware. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. Delaware applies the Statute of Frauds of the place where the contract was made, Canister Co. v.

---

**2.** New York

Section 31, subdiv. 1 of the Personal Property Law of the State of New York Consol.Laws N.Y. c. 41, provides:

"Agreements required to be in writing. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking;

"By its terms is not to be performed within one year from the making thereof * * *."

Section 85 in part provides:

" * * * but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply. * * *"

New Jersey

R.S. 25 :1-5, N.J.S.A., provides as follows:

"25:1-5. Promises or agreements not binding unless in writing.

"No action shall be brought upon any of the following agreements or promises, unless the agreement or promises, upon which such action shall be brought or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized:

\*     \*     \*     \*     \*

"e. An agreement that is not to be performed within one year from the making thereof."

N.J.S.A. 46:30-10, § 4, Uniform Sales Act in part provides:

" * * * but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business. the provisions of this section shall not apply."

National Can Corp., supra; Lams v. F. H. Smith Co., 6 W.W.Harr. 477, 178 A. 651, 105 A.L.R. 646, 647, which in this case is New York.[3]

There is compliance because the letter of Tully of January 18, 1950, referring to the contract for Smith's signature, with Brick's letter referring to the same contract, constituted a sufficient memorandum. The memorandum is sufficient because it states each party to the contract, the subject matter of the contract, and terms and conditions of all promises and by whom and to whom the promises are made. Restatement, Contracts, § 207. A memorandum may consist of several writings, only one of which need be signed. Restatement, Contracts, § 208. The only requirement is the signed writing refer to the unsigned writing or it appears from examination of all the writings the signed writing was signed with reference to the unsigned writings.

The facts satisfy these tests. The memorandum consists of the written contract contained in Tully's letter and the letters of Tully and Brick which refer to the written contract. Although the written contract was not signed, the letters were, in one instance by an officer of Onyx (i. e., Brick), and in the other two instances by Tully, its agent. These writings constitute a sufficient memorandum. Restatement, Contracts, § 208; Howell v. Witman-Schwartz Corp., 3 Cir., 1925, 7 F.2d 513; Title Guaranty & Surety Co. v. Lippincott, 252 Pa. 112, 97 A. 201; Ryan v. United States, 136 U.S. 68, 10 S.Ct. 913, 34 L. Ed. 447; Marks v. Cowdin, 226 N.Y. 138, 123 N.E. 139.

In addition, the Statute of Frauds does not even encompass the contract in this case. This is so whether the law of New York, § 85 or the law of New Jersey, N.J.S.A. 46:30-10, § 4, U.S.A., is considered. The rule is if goods (Revitex) are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the oral agreement is not embraced within the Statute of Frauds. Canister Co. v. National Can Corp., D.C. Del., 63 F.Supp. at page 368. Revitex was to be "tailor-made" and packaged for Smith. The elements were compounded pursuant to his suggestion. Furthermore, Onyx could not have sold this product (Revitex) to anyone else as it was packaged for Smith with his label and trade mark.

4. There were indications at trial Onyx has abandoned the defense the contract unlawfully restrains trade.

This contract does not violate either the Federal Anti-Trust Laws or the New York Statutes. There are no restrictions on the sale of the product by Smith. There is no tie-in arrangement. There is no restriction on the price at which Smith may sell. Nor is there any limit on the amount of Revitex Onyx will supply or Smith will sell to the public. The exclusive right to sell the secret combination, in limited fields, would be valuable to Smith in exploiting his trade mark and trade name, Revitex, but such right does not unlawfully restrain trade.

No court has held a comparable contract unlawfully restrains trade.

Onyx previously contended the contract was an exclusive sales arrangement, not an exclusive agency arrangement. This contention does not help Onyx even if it were valid. Contracts have been held valid under both names. The important thing is arrangements like the one between Onyx and Smith are sustained. Refusals to Sell and Public Control of Competition, 58 Yale Law Journal 1121, 1129 et seq. In fact this District and this Circuit have sustained such arrangements. Camfield Mfg. Co.

3. The result would be the same if it were held the contract was made in New Jersey because the pertinent statutory provisions are virtually the same in both New York and New Jersey.

v. McGraw Elec. Co., D.C.Del., 70 F. Supp. 477, 481; Brosious v. Pepsi-Cola Co., 3 Cir., 155 F.2d 99.

5. Where, as here, the suit is based mainly on loss of profits, it is always difficult to translate the wrong into terms of mathematical exactness. But it is the instruction of Judge Goodrich in Stentor Electric Mfg. Co. v. Klaxon Co., 3 Cir., 115 F.2d 268, when the fact of damage is certain the risk of uncertainty of the exact amount should be thrown upon the wrongdoer instead of upon the injured party. He further says, 115 F.2d at page 273 et seq.: "* * * Two basic principles must be balanced against each other. The reconciliation must be made between the principle that the plaintiff is entitled to compensation even though there is some uncertainty with respect to the amount, and the principle that the jury [or other trier of fact] must be furnished with reasonable guides by which to reach a verdict and will not be allowed to make an uncontrolled guess. On the general point it is said in the Restatement, Contracts, § 331, Comment a: 'The requirement of reasonable certainty does not mean that the plaintiff can recover nothing unless he establishes the total amount of his harm; nor does it mean that he cannot get damages unless he proves the exact amount of his harm. The requirement merely excludes those elements of harm that cannot be evaluated with a reasonable degree of certainty. * * * Furthermore, there are cases in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, while at the same time it is of such a character that the amount in money is incapable of proof. In these cases the defendant usually has reason to foresee this difficulty of proof and should not be allowed to profit by it. In such cases, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the jury, subject to the usual supervisory power of the court'."

The remaining question is whether the proof meets the tests fixed in the Klaxon case.

Smith testified he could have sold the minimum amounts provided for in the contract. Plaintiffs argue this testimony is supported because it is based on Smith's experience in selling in the dry cleaning and laundry industries. Apparently all agreed Smith was an excellent salesman. There is no question Smith would have had to promote the product vigorously to sell the minimum amounts. Plaintiffs argue Smith had a good trade mark and he would have succeeded in having Revitex identified with a good sizing in the minds of buyers. Thus, it is claimed, a good product, plus a good trade mark, insured the successful promotion of Revitex.

I am not convinced, as a matter of fact, Smith could have sold the minimum amounts. When he suspected he was not to receive a written memorial for his exclusive benefit he was unwilling to undertake nationwide promotion and advertising expense. Smith claims his loss of profits amounted to $109,304.47 and he is entitled to interest of 6% from January 31, 1950, which he claims is the date of breach. One of my difficulties with the latter point is, if there was breach in January, 1950, nevertheless Smith still proceeded with his promotional and selling activities until July, 1950. He must have been proceeding under the contract which I found existed between the parties.

At this point, I have no tangible guide to indicate what, in fact, profits Smith would have made. He testified, at length, from a chart, prepared by Ledoux, an accountant, what his profits would have been had he sold the amounts provided for in the contract. The factual data upon which the accountant rested his testimony was based on mathematical calculations, but the basic figures on which he relied were assumptions. The record shows, during the period from November 1949, when

Smith placed the first orders, until July 1950, when he stopped promotional activities, he sold 470 gallons of Revitex. The orders were from 80 to 90 of his customers, and at the time he had 500 customers. If there had been no breach, and projecting Smith's selling activities into the foreseeable future, on the basis of the factual data presented to me, the best estimate I can make of his loss of profits is $25,000.

6. Smith is entitled to interest on any judgment he may be awarded. § 480 of the Civil Practice Act of New York provides: "In every action wherein any sum of money shall be awarded by verdict, report or decision upon a cause of action for the enforcement of or based upon breach of performance of a contract, expressed or implied, interest shall be recovered upon the principal sum whether theretofore liquidated or unliquidated and shall be added to and be a part of the total sum awarded." Stentor Electric Mfg. Co. v. Klaxon Co., 3 Cir., 115 F.2d 268, 275–277,[4] is authority the facts of this case justify and compel a reference to the New York statute to determine Smith's right to interest. That case also establishes under New York practice interest runs from the date of commencement of action where there is no proof of a fixed date of breach, 115 F.2d at page 277. Such is the case here. Here the date of breach is not fixed and certain. Hence, Smith is entitled to interest from the time suit was instituted. The New York legal rate is 6%.

Judgment should be entered in favor of Smith in the amount of $25,000, plus interest at 6% from date of suit. Plaintiffs are also entitled to $3,758.79 for damages suffered through incurring expenses in going forward with the agreement.

---

4. The subsequent proceedings in the Stentor case—312 U.S. 674, 61 S.Ct. 734, 85 L.Ed. 1115, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, 3 Cir., 125 F.2d 820, 316 U.S. 685, 62 S.Ct. 1284, 86 L.Ed. 1757,—do not affect the vitality of Judge Goodrich's discussion of interest in 115 F.2d 268.