**CANISTER CO. v. NATIONAL CAN CORP.**

**CANISTER CO., Inc., v. SAME.**

Nos. 309, 365.

District Court, D. Delaware.

Nov. 17, 1945.

As Amended Dec. 13 and 27, 1945.
Motion to Vacate or Amend Denied
March 4, 1946.

See 64 F.Supp. 808.

See, also, 3 F.R.D. 279.

Hugh M. Morris (of Morris, Steel & Nichols), all of Wilmington, Del., for plaintiff.

William S. Potter and Collins J. Seitz (of Southerland, Berl & Potter), all of Wilmington, Del., for defendant.

LEAHY, District Judge.

This is an action for damages for breach of contract for failure of defendant[1] to deliver certain sets of metal ends[2] to be used for fibre body metal-end one-gallon paint cans. Diversity and requisite amount establish jurisdiction.

The alleged agreement upon which the action is based, as well as certain other agreements which preceded it, were not reduced to writing and were made in New York. In its answer defendant pleaded, among other defenses, that there was no contract between the parties and that if there were a contract between the parties it was unenforceable because it offended the New York Statute of Frauds. By order of the court, the defenses of no contract and Statute of Frauds were tried to the court without a jury as separate issues under Rule 42 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

At the trial plaintiff offered testimony of six oral agreements[3] between the parties touching on sets of metal ends for one-gallon fibre-body paint cans. Each of these agreements was made after this country entered the present war. Shortly thereafter the War Production Board began issuing metal conservation orders, restricting the use of metal. For civilian uses the packaging of paints was regarded as subject to such conservation orders. The restrictions upon the use of metal for civilian purposes were progressively made more drastic until, by order of February 18, 1943, paint can materials were restricted to fibre body and blackplate ends, and, of this, 50% of the bottoms were required to be made from frozen blackplate or blackplate rejects.

Prior to our entry into the war and before the issuance of the War Production

---

[1] There are two actions involved here: one, The Canister Company vs. National Can Corporation, herein referred to as "National", and two, The Canister Company, Inc., assignee of The Canister Company, herein referred to as "Canister", vs. National Can Corporation. Both actions, for present purposes, raise the same legal questions and will be treated as if there were but one action.

[2] Set, as used herein, consists of a metal bottom, a ring and a plug.

[3] Although the action is not based on all six agreements, it will nevertheless be helpful to consider all of them in order to get an accurate picture of the circumstances under which the complained of major agreement was made. The six agreements were these:

1. November, 1942—600,000 sets of terneplate parts. This agreement, though oral, was confirmed by letter from Canister to National and was subsequently acknowledged by National by letter.

2. November, 1942—100,000 additional sets of terneplate parts. This agreement, also oral, was confirmed by letter from Canister and acknowledged by National by letter.

3. December, 1942—300,000 sets of blackplate. This agreement, also oral, was acknowledged by Canister by letter.

4. January, 1943—1,000,000 additional sets of blackplate parts. This agreement, also oral, was confirmed by letter of Canister and, some three months later, acknowledged by National by letter.

5. February, 1943—1,000,000 additional sets of blackplate parts.

6. February 17, 1943—capacity agreement for sets of blackplate parts.

These last two agreements were not confirmed by either party in writing; but Canister reduced its understanding of the contract into a memorandum dated some six months later, the probative value of which will be discussed later.

Board's metal conservation orders, National made all-metal paint cans. Canister had never made all-metal cans but had made composite containers having a body of fibre or paper and metal ends. It appears to have been one of the first companies in this country to manufacture such composite containers.

From early in 1941 until April 3, 1943, Gieg was president of National and Gwathmey was president of Canister. The evidence supports the conclusion that each was aware of the effects of the metal conservation orders upon the business of their respective companies; i. e., adverse to National and beneficial to Canister. The threatened contraction of National's business from normal approximated 50%. Accordingly, it had immediate need of creating business to replace that of making all-metal cans which the conservation orders had spragged. These orders of necessity increased the demand for composite paint cans. The market need for such cans was estimated to be around 150,000,000 a year. This demand was greatly beneficial to Canister because it possessed the "know how" of the manufacture and supply of such cans. The evidence shows that both Gieg and Gwathmey were of opinion that the composite can was the only favorable substitute for the banned all-metal paint can. The short of the matter is that National wanted to sell metal end parts and Canister wanted to buy them. For business reasons, National could not competently make composite cans and Canister could not manufacture the metal end parts in sufficient quantity to satisfy the demand for such composite containers.

It was on the basis of this detailed situation that Gieg and Gawthmey started to make arrangements for the exploitation of both companies' mutual operations. Some time in July, 1942, Gieg and Gwathmey started their conferences. After samples had been submitted to Canister, National was requested to survey the situation and be prepared to tell Canister whether it could supply to Canister "several million or more of sets of metal ends". On September 9, 1942, National sent to Canister a recapitulation of prices for metal ends and also a statement of National's charge for changing its dies to correspond with the changes requested by Canister.

Between the middle of November, 1942, and the end of the first week in February, 1943, contracts for 3,000,000 sets of metal ends had been orally ordered by Canister and acknowledged by National. The agreement made in February, 1943, was for 1,-000,000 sets and preceded the meeting at which the alleged capacity agreement was made. Just prior to February 17, 1943, Gieg learned that the deadline of February 15, 1943, fixed by the War Production Board orders for composite paint cans, would be removed by a new order of that body. He so advised Gwathmey, and the conference of February 17, 1943, at the Ritz-Carlton Hotel in New York followed. Gwathmey testified that a capacity agreement [4] was entered into at the conference. Canister's

---

[4] Canister sets out the capacity agreement in its bill of particulars in these words:

"1. That defendant would furnish to plaintiff daily thenceforth its entire capacity output of metal sets of fittings for plaintiff's fibre-body one-gallon paint can, each set consisting of a bottom, a ring and a plug at the price of $36.00 per thousand sets of metal parts, f.o.b. defendant's Maspeth, Long Island plant, terms 1% 10 days net 30, and would continue so to do until it received 30 days' notice from plaintiff to discontinue or reduce its production for plaintiff.

"2. That plaintiff would accept said capacity production and pay the price stated according to the terms stated.

"3. That said metal parts would be of good quality and workmanship, manufactured according to plaintiff's design and requirements for use by plaintiff on its fibre-body one-gallon paint can.

"4. That plaintiff would use said parts on its one-gallon can for which it had large commitments and which it was offering to the entire paint industry who were in great need of plaintiff's fibre-body metal-ends paint can since the government had ruled out for the use of paints and other liquids all-metal containers.

"5. That defendant would immediately step up its production rate as rapidly as possible to make deliveries to plaintiff of 100,000 sets daily.

"6. That defendant would utilize for the benefit of plaintiff's 'capacity contract' all of its 'frozen blackplate' in connection with the manufacture and delivery of the metal sets to plaintiff for its one-gallon paint can.

"7. That the said metal parts were to be struck from dies, or replicas thereof, which had been theretofore specially altered and redesigned according to plaintiff's specifications for plaintiff, and at plaintiff's.

commitments were becoming greater all the time and it was thought better to have a capacity arrangement rather than to be continually ordering another million sets. The only limit on what National was to supply was placed at 100,000 sets a day. This was greatly in excess of its existing production at the time Gieg and Gwathmey held their conference at the Ritz-Carlton Hotel, but defendant was to furnish plaintiff up to 100,000 sets per day as soon as it could get into such production. Gwathmey testified that Canister had the right to terminate the contract on 30 days notice, subject only to the responsibility for such parts as were partially made. The sets were to be of good commercial quality for the industry and the design and size were to be the same as the ends previously delivered by National to Canister. In fact, it appears that the sets were to be struck from the same dies that were specially designed for Canister or from perfect replicas of them.

Gieg, who was called as a witness by defendant, confirms most of Gwathmey's testimony. With respect to the Ritz-Carlton conference, he testified that there was a definite understanding that whatever National was able to make Canister would take, up to 100,000 per day, and that Gieg, on behalf of National, agreed to turn out 100,000 per day as fast as possible. In other words, both Gieg and Gwathmey agreed that Canister was to get all of National's capacity up to 100,000 sets per day. On this most important aspect of the agreement there is, then, no dispute. Gieg testified that Mr. Murphy [5] of National was cognizant of everything that he did with Gwathmey. Gieg also agreed with Gwathmey as to the price and terms of payment. Gieg's testimony was not very clear relative to the 30 day termination provision which Gwathmey testified was agreed to. But that vagueness is more apparent than real. Gieg's testimony has been interpreted to mean that there was a provision for Canister to cancel upon 30 days' notice, subject to the condition that Canister take certain material, if any were on hand at the time, from National. The basis for this interpretation is that both Gwathmey and Gieg agree upon every other salient term of the agreement and Gieg in this respect does not flatly contradict Gwathmey. His testimony on this point, at most, is equivocal. Although it was not expressed with particularity at the Ritz-Carlton conference, it appears to have been the understanding of the parties that National could terminate the agreement upon the revocation by the War Production Board of the metal conservation orders banning the all-metal paint cans which National had made before the first of the WPB orders became effective. Canister did not exercise any right to terminate the capacity agreement and the War Production Board had not, until January 3, 1944, removed the ban upon the manufacture of all-metal cans for paint. National, on April 13, 1943, repudiated the oral agreement on February 17, 1943, and re-affirmed that repudiation by its letter of May 8, 1943.

Plaintiff contends that the agreement resulting from the conference at the Ritz-Carlton Hotel constituted a capacity contract and that the oral agreement for the 3,000,000 sets was necessarily merged into that capacity contract. It argues further that the capacity contract does not offend the New York Statute of Frauds [6] and

---

cost in accordance with the letter from plaintiff to defendant of November 17, 1942 and the letters from defendant to plaintiff of November 18 and 19, 1942 (set out in response to defendant's request (a) ).

"8. That defendant and plaintiff would cooperate to the closest extent in the performance of the said 'capacity contract' to the end that plaintiff should be able to utilize to plaintiff's profit and advantage the unusual opportunity which plaintiff then had and would have for the expansion of plaintiff's business and good will and in the sale of its fibre-body containers as substitutes for metal containers."

[5] Mr. Murphy, a Vice-President of National, was not called as a witness by National to contradict Gieg's testimony in this connection, although he gave certain testimony by way of deposition on other unrelated matters.

[6] Sec. 31 of the Personal Property Law of the State of New York Consol.Laws N. Y. c. 41, provides:

"Agreements required to be in writing. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

"1. By its terms is not to be performed within one year from the making thereof.
* * *"

Sec. 85 provides:

"1. A contract to sell or a sale of any goods or choses in action of the value of fifty dollars or upwards shall not be en-

claims that that is the proper statute of frauds to consider. Defendant, on the other hand, contends that there was no contract because (1) there was an absence of contractual intent, because (2) the alleged agreement is too indefinite, because (3) there was no meeting of minds, because (4) Gieg had no authority to enter into the contract as alleged and finally because there was a failure to comply with Conservation Order M–81; but, if there was a contract it offends the New York Statute of Frauds.

The no-contract issue will be discussed first, and all the specific reasons urged by defendant to support that issue will be considered together. This will be followed by discussion of the other two main issues raised by defendant, i. e., the New York Statute of Frauds and the pertinency of WPB Conservation Order M–81.

■■■ 1. The parties entered into a contract.[7] It is true that mutual assent is an essential prerequisite[8] of the formation of a contract. But the test as to whether there is mutual assent is objective and does not depend upon the undisclosed intentions of the parties.[9] Since the test is objective, the formation of a contract does not require "the meeting of the minds" of the parties.[10] Despite early dicta to the contrary, this view is now almost universally accepted. One writer (8 Can.B.Rev. 299,

forceable by action *unless the buyer shall accept part of the goods* or choses in action so contracted to be sold or sold, *and actually receive the same*, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf.

"2. The provisions of this section apply to every such contract or sale, notwithstanding that the goods may be intended to be delivered at some future time or may not at the time of such contract or sale be actually made, procured, or provided, or fit or ready for delivery, or some act may be requisite for the making or completing thereof, or rendering the same fit for delivery; *but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply.*

"3. There is an acceptance of goods within the meaning of this section when the buyer, either before or after delivery of the goods, expresses by words or conduct his assent to becoming the owner of those specific goods." (Emphasis supplied.)

[7] Jurisdiction is here based on diversity of citizenship. The Delaware conflict rule applies in the matter of which law governs as to whether a contract was formed. See Stentor Electric Manufacturing Co. v. Klaxon Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. Since the agreement was entered into in New York and since most of the performance was to take place in New York, it is clear that New York law controls. See Maberry v. Shisler, 1833, 1 Har., Del., 349; Mackenzie Oil Co. v. Omar Oil & Gas Co., 34 Del. 435, 154 A. 883; Phœnix Oil Co. v. Mackenzie Oil Co., 34 Del. 460, 154 A. 894.

[8] Statement in the text is generally true, but there are a few situations where contracts may be formed without the manifestation of mutual assent. In a fairly recent case a gratuitous bailee, for example, was held liable on his promise to take out insurance on the property for the benefit of the bailor. Siegel v. Spear & Co., 234 N.Y. 479, 138 N.E. 414, 26 A.L.R. 1205, noted 23 Col.L.Rev. 573, 32 Yale Law Journal, 609, 9 Cornell Law Quarterly 54, 22 Mich.Law Review 74.

[9] Many statements support the text. "It is trite learning that the thought of man is not triable, for the devil himself knows not the thought of man." Brian in Y.B. 17 Edw. IV 1; in Browne v. Hare, 3 Hurlston and Norman, 484, 485, Bramwell, B., said: "Intention is immaterial till it manifests itself in action. If a man intends to buy, and says so to the intended seller and he intends to sell, and says so to the intended buyer, there is a contract of sale; and so there would be if neither had the intention. If there is a contract of sale, and the seller intends to appropriate a particular chattel in fulfillment of it, and the buyer intends to accept, and accepts, the property vests in him; and so it would had there been no such intention. If the buyer refuses, and the chattel corresponds with the contract, the vendor has a right of action, not because of his intention, but of his offer. An intention not communicated to the buyer is immaterial. Telling it to an indifferent person is no more than though he had noted it in his memorandum book, which is no more than though it existed in his own mind." In O'Donnell v. Clinton, 145 Mass. 461, 463, 14 N.E. 747, 751, Holmes, J., said: "Assent, in the sense of the law, is a matter of overt acts, not of inward unanimity in motives, design, or the interpretation of words."

[10] Again in The Path of the Law (10 Har.L.Rev. 457, 464) Holmes likewise

300) has said that: "The expression consensus ad idem so often quoted in contract cases does not necessarily mean that both parties to the contract are actually of the same mind with respect to the same subject matter and import of its terms. There need not be a coincidence of mental images; it is sufficient that there be an expressed or objective mutual assent." See Williston on Contracts, Sec. 22.

 Intention to contract is likewise an essential prerequisite to the formation of a contract. This intention need not, however, take on any particular form of expression and may also be gained from acts. In Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214, Cardozo, J., said: "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation', imperfectly expressed. * * * If that is so, there is a contract." In the instant case it is clear that the parties intended to enter into a contractual arrangement. Not only did the parties say so, though perhaps imperfectly, but the surrounding circumstances reenforce the conclusion that there was such an intention. In view of previous discussions and knowing that some arrangement between National and Canister would be mutually beneficial, and in view of Gieg's knowledge that the deadline of February 15, 1943, on composite paint cans would be removed, it is unlikely that Gieg and Gwathmey would meet in conference and not intend the resultant agreement to create contractual obligations.

 Defendant makes much of the absence of a writing to evidence the agreement of the parties. It argues that business men do not normally make contracts involving so much money without some memorandum or writing; and reliance is had on the Delaware cases [11] of Canadian Industrial Alcohol Co. v. Nelson, 188 A. 39, 57, and Kennedy et al. v. Emerald Coal

& Coke Co., 42 A.2d 398, to show the importance of the lack of a writing when attempt is made to enforce a parol agreement. There are several answers to this argument. In the first place, in both of the Delaware authorities relied upon there was a sharp conflict in the testimony, while in the case at bar both parties agree as to the essential features of the agreement. In the second place, there was testimony here that such practice was common in this particular industry and, further than that, the early agreements were admittedly carried on and consummated in the same fashion as the complained capacity agreement. It is concluded, then, that the circumstances clearly demonstrate the intention to create contractual obligations by the parties.

 Defendant further argues that the alleged agreement is too indefinite to constitute a contract and that there was no "meeting of minds" of the parties on certain essential terms of it. The mutual promises made by each of the parties amply meet the test of definiteness, as enunciated in the text and the many cases cited in 1 Williston on Contracts, Sec. 46. Such promises as "not to disturb or annoy or make any demands", Sharon v. Sharon, 68 Cal. 29, 8 P. 614, as a promise not to contest a will and to suppress resentment against a stepmother and make it a home harmonious, Whitherington v. Eldredge, 264 Mass. 166, 162 N.E. 300, were held sufficiently definite. See, too, Superior Tube Co. v. Delaware Aircraft Industries, D.C. Del., 4 F.R.D. 139.

Now the agreement in suit is perfectly definite as to all essential matters. In some of the essential matters the conflict in the testimony as to the nature of the terms is not serious. It is claimed, for example, that there was no agreement as to which of defendant's plants—whether all or just one of them—was to produce its capacity for plaintiff. A careful reading of the testimony makes it clear that only the capacity of defendant's Maspeth, Long Island, plant was involved. The price is quoted as f.o.b.

---

wrote: "In my opinion no one will understand the true theory of contract or be able to discuss some fundamental questions intelligently until he has understood that all contracts are formal, that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs,— not on the parties' having *meant* the same

thing but on their having *said* the same thing."

[11] I do not agree with these Delaware pronouncements, for my experience indicates (and there was some testimony to this effect) that "big business" ventures are frequently conducted on an oral basis, sometimes for legitimate and at other times for illegitimate purposes.

defendant's Maspeth, Long Island, plant. Since there is no testimony which would serve to contradict this conclusion and since that conclusion is compelled by the plain words of the agreement as alleged in the bill of particulars, it is concluded that this term of the agreement is sufficiently definite. Defendant further argues that the parties did not agree as to whether there were to be written orders and that both parties were indefinite as to one or more of the termination dates. But the parties were very specific as to the termination dates, viz., the agreement was to run until WPB rescinded its order banning all-metal cans for paint. Whether there were to be written orders is too inconsequential to be of any moment.

■ Defendant further argues that there was no contract because Gieg had no authority to enter into the contract contended for by plaintiff. The alleged agreement was certainly not ultra vires the corporation and as Gieg, as president, had apparent authority to enter into the agreement in question, the requirements of the law are satisfied; Greenspon's Sons Iron & Steel Co. v. Pecos Valley Gas, 4 W.W. Harr. 567, 156 A. 350. The president, as a general agent of a corporation, may perform all acts of an ordinary nature which by usage are incident to the office. It is reasonable to assume that the general manager of a corporation may make contracts in the ordinary course of business. There is no established practice and no such authority has been cited which compels the business contracts of the defendant corporation to be submitted to the board of directors for ratification before they become binding. Now, it is true that the capacity agreement considered alone might not be a contract made in the usual course of business; nevertheless, when the course of conduct by the parties over the preceding few months is considered, it was entered into in the ordinary course of business. Several of the prior oral agreements were confirmed in writing and it was apparent to the presidents of both parties and must also have been apparent to the board of directors that defendant could no longer

make all-metal one-gallon paint cans and could not, from a business point of view, make the composite cans. Apparent authority may arise by implication, as a result of the officer being held out by custom or by course of dealing or by the exigencies of a situation. Citation of authority of these settled rules of the law of agency need hardly be made. Plaintiff was certainly justified in assuming the matters discussed in the earlier conferences had been brought to the attention of defendant's board of directors and that they had concluded, as had their president, that the capacity agreement entered into was beneficial.

The conclusion is, then, that a contractual agreement was entered into in New York on or about February 17, 1943, and that such agreement compelled National to deliver to Canister its entire capacity at the Maspeth, Long Island, plant up to 100,000 sets per day.

■ 2. The capacity contract does not offend the New York Statute of Frauds. It is apparent that the pertinent Statute of Frauds is that of New York. Delaware regards the Statute of Frauds as substantive and applies the statute of the place where the contract was executed; Lams v. F. H. Smith Co., 6 W.W.Harr. 477, 178 A. 651, 105 A.L.R. 646; and the Delaware conflicts rule as to the governing Statute of Frauds controls here. Cf. Stentor Electric Mfg. Co. v. Klaxon, supra. Under New York law contracts to run for the duration of the war do not offend the New York Statute of Frauds as the contracts are to end on the happening of an event which might occur within the year. Steiner v. Fenster, Sup., 51 N.Y.S.2d 814.[12] This is but a particularization of the general rule that an agreement, the duration of which depends upon the happening of a contingency which may occur within the year, does not violate the Statute of Frauds. Blake v. Voight, 134 N.Y. 69, 31 N.E. 256, 30 Am.St.Rep. 622.[13] Now the evidence is clear that not only was the contract to end upon the termination of the war but sooner perhaps, i. e., when the WPB order was revoked or modified. Whether the Board's order was

[12] Recently a federal court had occasion to observe that there is a rigidity of decision forced upon us by Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, and we are consequently required to follow what New York says falls without its Statute of Frauds. See, opinion of Judge Clark in Droste v. Harry Atlas Sons, 2 Cir., 145 F.2d 899, 901.

[13] For the most recent case, see High v. Pritzker, —— Misc. ——, 58 N.Y.S. 706.

revoked or modified after the termination of the war is immaterial; the important consideration is that it was an event of uncertain duration. Moreover, under Section 85 of the Personal Property Law of the State of New York, if goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, an oral agreement for the manufacture of such goods does not fall within the New York Statute of Frauds. Here, the evidence was ample to show that the metal ends were tailor-made by defendant for plaintiff. It seems difficult to take any other view, especially in the light of the elaborate drawings which were made for the metal ends which plaintiff desired. And special dies were constructed to pattern the particular product which plaintiff intended to use as a composite part of the fibre-metal container which it sought to market. It is clear, therefore, that the facts adduced at trial show that the agreement under consideration does not fall within the New York Statute of Frauds.

■ 3. There remains the most difficult part of the case to decide. Having concluded a contract existed and that it did not violate the New York Statute of Frauds, that contract should not be enforceable if plaintiff has clearly violated an emergency war regulation.

Defendant claims that, even if "some sort of agreement" was had between the parties, such contract is unenforceable as against public policy because plaintiff failed to comply with the War Production Board's Conservation Order M–81; that is, defendant never asked for a purchaser's certificate as required under the order. Section (b) (1) of the order provides:

"Restrictions upon manufacture, sale, and delivery of cans. (1) No person shall sell or deliver any can except under a purchase order or contract validated by a delivery to such person of a purchaser's certificate, manually signed by the purchaser or an authorized official of the purchaser, in substantially the form attached * * *".

Plaintiff argues that M–81 applies only to a can; and that the dictionary meaning of a can shows that it is (a) a container, (b) made in whole or in part of metal, and (c) is suitable for packing a product. The order itself contains a definition. Section 1060–8–1 states that a "Can means any unused container which is made in whole or in part of tinplate, terneplate, blackplate or waste and which is suitable for packing any product. The term includes any container closure, or fitting made in whole or in part of tinplate, terneplate, blackplate or waste, but it does not include a closure or fitting to be used on or as a part of a glass container." Plaintiff argues that the first sentence of the definition defines a "can", and that the second sentence does not say that the closure or fitting is itself a "can". The point is made that M–81 has no application to the sale of closures or fittings. as such, the argument taking this form— there is no prohibition against manufacturing tinplate, etc., closures or fittings because they can certainly be used in connection with glass containers; therefore the order was never contemplated to include the fittings because a fitting is not a can and there is no prohibition against the manufacturing and hence the sale of such parts without a purchaser's certificate.

Defendant claims the definition found in Section 1060–8–1 brings within its operation the metal ends involved here. It argues that the evolution of the definition shows that, by virtue of the various amendments to the regulation, it was repeatedly broadened for just such purpose. Defendant has produced affidavits from the executives of other large can companies which together control a high percentage of the container industry. They all are in agreement that a metal end means a "can" within the M–81 definition. Their statements are to the effect that, while their respective companies did not find themselves in the position of the parties in the case at bar because they neither bought nor sold parts or ends for fibre cans, they would have required purchaser's certificates had they done so. There is also an affidavit of an attorney in WPB who deposes that there has never been any official departmental or administrative interpretation of the question we face here, but that it is his opinion blackplate ends and fittings are a "can". Plaintiff filed an opposing affidavit of one of its officers who states there is no help outside the framework of the definition itself because there were no other parties in the industry—except plaintiff and defendant— who bought and sold parts or ends of cans.

Consequently, from the record before us, the only interpretation of M–81 made in the industry was made by plaintiff and defendant. This interpretation was that M–81

did not require defendant to obtain a purchaser's certificate from plaintiff. It was not until defendant failed to deliver metal ends to plaintiff and after the parties had entered into controversy that defendant demanded and received such a certificate.

The conclusion is that the purpose of M–81 was to regulate the use of cans "suitable for packing any product" made in whole or in part of metals and to require a purchaser's certificate by the seller when he sold such cans. The evidence shows that plaintiff did require and obtained a purchaser's certificate from each of its customers.

This, as the correct interpretation of the definition of "can", is reenforced by several considerations. The first sentence of the definition of terms defines "can" in the conventional way, and while Congress, or its agent WPB, may give an unconventional meaning to the term "can", it must do this with unmistakable clarity, for a court should not vitiate an agreement as opposed to a declared public policy unless the violation of that public policy is obvious and certain. Here, the whole language is perfectly consistent with the conventional definition of the term, because to say that a "term includes" does not mean that the thing included is itself a can.[14] Moreover, no dominant purpose is apparent why the conventional or dictionary meaning should not be applied here.

Finally, it must be conceded that the purpose of M–81 is to conserve certain types of metal. Defendant strongly urges that its position is supported by a controlling public policy in that it makes for better enforcement of the conservation order. But to require the manufacturing plaintiff to give a purchaser's certificate to National is without point, since Canister could have obtained the same metal for use in connection with glass containers; then, it is agreed, no purchaser's certificate would have been required. A purchaser's certificate from plaintiff to defendant would not aid the enforcement authorities. Investigation for purposes of enforcement of the order must, of necessity, start with the manufacturer, and consequently this final argument of defendant is not persuasive.

Judgment is for plaintiff on the separate issues tried. The question of damages will be determined in further proceedings.

---

[14] As counsel for plaintiff states in his brief: "A wheel includes spokes, but that does not mean that spokes are a wheel."