## SMITH et al. v. ONYX OIL & CHEM-ICAL CO.

### Civ. A. No. 1333.

United States District Court
D. Delaware.

July 24, 1952.

Petition for Reconsideration or Reargument
Denied Sept. 9, 1952.

Arthur G. Logan and Stephen E. Hamilton, Jr. (of Logan, Marvel & Boggs), of Wilmington, Del., for plaintiffs.

Arthur G. Connolly, of Wilmington, Del., for defendant.

LEAHY, Chief Judge.

This is an action brought by Laurence C. Smith and Laura C. Smith, co-partners, trading as Laurence C. Smith Co.,[1] against the Onyx Oil and Chemical Company, a Delaware corporation.[2] Smith seeks damages for breach of a contract whereby Onyx agreed to supply Smith with a compound known as "Revitex", used by dry cleaners in the wet cleaning process. Onyx has moved for summary judgment based upon the following grounds: (1) There was no written agreement executed by the parties although that was their intention and, therefore, there has been no compliance with the statute of frauds; (2) even if a contract be conceded, it is nevertheless unenforceable because it was procured by Smith's misrepresentation and concealment of essential facts; and (3) again assuming a contract, the contract is in restraint of trade and violative of antitrust laws.

The case is before the court on the pleadings, deposition, interrogatories and answers thereto and affidavits. Smith's facts are these: Onyx is a small manufacturing company which for many years has sold throughout the country a compound known as Resin 362 and another known as Onyxsan HSB. Onyx thought these two products would be useful in the wet cleaning. part of the dry cleaning business. It discussed its idea with people by the name of Harris,[3] of Courtland, New York. Harris suggested Onyx should employ Smith to distribute the compound since he was an excellent salesman. Two representatives of Onyx called on Smith and asked him if he would be interested in distributing these products. After witnessing several demonstrations of the use of the products, Smith was not particularly impressed since the two elements had to be assembled at the dry cleaning plants before they could be used. Smith told the Onyx representatives he might be interested if the two elements could be combined at the Onyx factory and sold as a compound. Experiments were carried out on the Smith suggestion with success. Smith then became enthusiastic about the possibilities of the compound. With the knowledge of the Onyx people,

1. Hereinafter referred to as "Smith".

2. Hereinafter referred to as "Onyx".

3. Hereinafter referred to as "Harris".

Smith registered the name "Revitex" for the compound in the State of New York.

Subsequent to the naming of the compound Revitex, Harris approached Smith and asked: "Well, what am I going to get out of this?" Smith agreed Harris was entitled to something for bringing Onyx and him together and for technical assistance which it was expected Harris would render. It was agreed, however, between Smith and Harris that no definite contract should be entered into until Smith had first received a national exclusive agency for Revitex from Onyx. Smith claims it was his understanding and intention that Harris would be compensated for technical assistance and for bringing the parties together, not that Harris should receive a royalty on all sales without restriction.

Smith claims to have been orally appointed Onyx's "exclusive agent" for the sale of Revitex in the Autumn of 1949 by two sales agents of Onyx, although he admits the terms were to be worked out at a later date. Smith urged the exclusive agency contract be reduced to writing. In early December, 1949, Smith claims he and Onyx had reached an agreement on all the important terms of the contract, though there were a number of details which had not been resolved. After a meeting on December 12, 1949, Smith contends all the important issues and many minor ones were resolved. By January 17, 1950, only one minor issue remained—the amount of Revitex Smith was required to purchase during the first year. This issue was resolved by telephone and confirmed by a letter by Onyx dated January 20, 1950.

Prior to this time, James H. Tully, Onyx's attorney, had sent to Smith's attorneys a draft of an agreement between Smith and Onyx. In his letter Tully requested the agreement be executed "on behalf of the Smith Company by Mr. Smith as partner" and the original returned to Tully. Tully further intended to have a duplicate copy of the original executed by Onyx and send it to Smith's attorney upon receipt of the executed original. On January 20, 1950, Tully sent another letter to Smith's attorney in which he referred to a certain schedule which, when completed, Tully said would be annexed to the copy of the agreement "being executed by Onyx" and then sent to Smith's attorneys.

Smith claims by January 21, 1950, if not earlier, a contract existed between Smith and Onyx. The letters, making reference to the agreement, sent by Tully, who Smith asserts was the authorized agent of Onyx, are in Smith's opinion sufficient compliance with the statute of frauds where the alleged contract—if there was a contract—is said to have been made. Smith, moreover, claims the contract here is not even embraced by the statute of frauds so as to make compliance with the statute necessary.

Smith denies any misrepresentation to or concealment from Onyx concerning any transaction Smith had with Harris. Smith claims Onyx told him it desired to deal directly and solely with him so he therefore did not take up with Onyx a proposed three party agreement among Onyx, Harris and Smith. The agreement at any rate was not acceptable to Smith since it conflicted with his previous understanding with Harris in that Smith agreed to employ Harris in a technical capacity with a royalty tied to the technical assistance furnished and not that Harris should receive a royalty on every gallon sold. Smith asserts he never signed an agreement with Harris and, in fact, it was understood between them they would not negotiate until after Smith's negotiations with Onyx had been completed. Smith, therefore, asserts he is not liable to Harris for any royalty payments. The only possible liability of Onyx, in the view of Smith, would come from Harris' assertion he developed Revitex and that dispute would be between Harris and Onyx and unrelated to Smith. Finally, Smith argues his agreement with Onyx is not in restraint of trade, does not violate the antitrust laws and therefore is enforceable. Smith concludes he is at a loss to understand why Onyx repudiated its contract with him.

Turning to Onyx's view of the facts, it is immediately apparent this case cannot be decided on a motion for summary judgment. Hart & Co. v. Recordgraph Corp., 3 Cir., 169 F.2d 580. Rather than detail the factual differences I merely list several

of them in question form which because of their materiality bar summary disposition of this action: (1) Was Tully acting as agent of Onyx? Onyx claims he only had power to draft an agreement while Smith asserts he could bind Onyx. (2) Was an oral agreement and contract completed between Smith and•Onyx prior to Onyx's letter of repudiation? Onyx says, "No"; Smith, "Yes". (3) Was Revitex manufactured by Onyx especially for Smith? Smith says, "Yes", and if this question is resolved in Smith's favor the defense of statute of frauds may very well not be available to Onyx. Canister Co. v. National Can Corp., D.C.Del., 63 F.Supp. 361, 368. (4) Did Smith conceal any material facts which he was duty bound to disclose to Onyx? Onyx and Smith are at complete variance here.

Summary judgment for defendant is denied. Let an order be submitted.

On Petition for Reconsideration

 Onyx has filed a "Petition for Reconsideration" seeking a determination at this time on its defense the agreement in suit is in restraint of trade, violates the antitrust laws, and is, therefore, unenforceable. This defense was one of the grounds Onyx urged in its motion for summary judgment which I denied. Onyx submits this defense can be decided on a motion for summary judgment since there are in its opinion no factual questions barring summary disposition. I disagree.

Onyx claims the contract "reveals clearly * * * it is an exclusive sales contract." Smith asserts the agreement is one of agency. Onyx's argument is there are no facts to support the Smith assertion.

When one turns, however, to Interrogatory No. ·7 served by Smith on Onyx February 2, 1951, and the answer served by Onyx February 16, 1951, there appears in Onyx's words the purpose of negotiations between it and Smith; the gist of the answer was Smith was to become "an exclusive distributor *for* defendant." (Emphasis added.) There is much, it is true, in the present record indicating the contract was entirely a sales contract; yet there are also certain facts pointing to an agency relationship, see e. g. the proposed tripartite agreement. The words "exclusive distributor" alone do not necessarily connote only one relationship which can be pigeon-holed as either sales contract or agency contract. If an agency contract was contemplated, assuming I find a valid contract, it may never be necessary to consider the defense raised now by Onyx. If a sales contract is found, again assuming I find a valid contract, then Onyx's defense would be relevant. What an "exclusive distributor" is, is to me a factual question about which I should like to hear a little more.

And now, to-wit, this ninth day of September, A. D. 1952, defendant's motion for reconsideration or reargument having been read and considered, it is

Ordered, defendant's motion for reargument be and the same hereby is denied.