**SOCIETE COTONNIERE DU TONKIN**
v.
**UNITED STATES.**
No. 388–55.

United States Court of Claims.
April 8, 1959.

Richard J. Cronan, New York City, for plaintiff. Francis Currie, Lawrence M. Powers and Burns, Currie, Maloney & Rice, New York City, were on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

This action involves certain bales of cotton presently stored in warehouses in Saigon, Republic of Vietnam. The plaintiff seeks recovery from the United States on alternative grounds: (1) the Government breached a contract with plaintiff for the purchase of the cotton, or (2) the plaintiff was so dealt with by the Government that a requisitioning of the cotton occurred, for which the Government must pay just compensation.

The plaintiff corporation was formerly engaged in the manufacture of cotton in Vietnam. Its manufacturing activities were conducted in Haiphong and Nam Dinh, which, prior to the Communist invasion of that area, were important in-

dustrial centers located in northern Vietnam. Headquarters for the plaintiff's operations were located in southern Vietnam, in the capital city of Saigon.

The genesis of this dispute lies in the purchase by Societe Cotonniere of cotton under this Government's Foreign Operations Administration program. A brief explanation of the program, its purposes and mechanics, is required in order to gain a clear understanding of this litigation.

On April 3, 1948, Congress approved an act creating the Economic Cooperation Administration "for the purpose of assisting certain foreign countries to achieve economic stability and independence through the promotion of increased agricultural and industrial productivity, monetary stability, and the growth of international trade", 62 Stat. 137, 22 U.S.C.A. § 1501 et seq.; Cong.Dir., 81st Cong., 2d sess., Jan. 1950, p. 670. Under this program, the Economic Cooperation Administration had established by 1951 a Mission in Saigon for the administration of aid to Cambodia, Laos, and Vietnam. During the year we are to be concerned with, 1954, the functions formerly exercised by the Economic Cooperation Administration were being conducted by the Foreign Operations Administration (FOA).

The FOA program of economic aid was designed in part to assist in overcoming obstacles to foreign trade arising from the beneficiary countries' lack of credits convertible into dollars.

For an example of how this objective was realized, consider the manner in which the cotton in suit was acquired by plaintiff, a Vietnamese manufacturer: The cotton was purchased from American suppliers. These suppliers were paid in dollars which came from congressional foreign aid appropriations. At all times the dollars remained in the United States. The plaintiff paid for the cotton in the local currency—piastres—at the prevailing rate of exchange. The piastres never left Vietnam. They were received by the Government of Vietnam as "counterpart funds" which were used to finance public

works projects initiated by the Vietnamese Government and approved by FOA.

The transaction was carried out through normal commercial and banking channels. FOA's participation in the transaction was limited to the extent of assuring (1) competitive bidding by American suppliers; (2) dollar payments to the American banks which handled the sight drafts, invoices and bills of lading; and (3) transfer of the piastres paid by plaintiff into counterpart funds. Such was the extent of FOA's authority. It neither bought the cotton from the suppliers nor sold it to the purchaser.

The economic aid agreement between the United States and Vietnam contained a provision for end-use checks by FOA of the commodities provided under the program. The end-use check was for the purpose of assuring that congressional appropriations were being used for the purposes intended; i. e., to verify that the property supplied under the aid program was being used to promote the economy of the beneficiary country. Where an end-use violation was discovered, the United States could only demand a refund by the beneficiary government to the United States of the dollar value of the commodities misused.

The Societe Cotonniere began purchasing cotton under this program soon after the Mission was established in Saigon. The cotton we are concerned with consists of 4,351 bales, which were part of 6,450 bales purchased in January 1954. Deliveries were made shortly after the purchase. In May 1954, plaintiff also purchased through FOA some 3,250 additional bales of cotton.

Events that followed were shaped by the nationalist upheaval against French authority which began in northern Vietnam in 1946, and reached a climax in July 1954, with the Viet Minh-Communist occupation of northern Vietnam.

About the middle of June 1954, the plaintiff's general manager was notified by the French military commander that Nam Dinh, where plaintiff's mill was located, was soon to be evacuated by the French forces. Acting on this informa-

tion the plaintiff decided to request the Mission to cancel the contracts for cotton purchased in May and not yet delivered. The request for cancellation was made on June 18, 1954. On the following day, June 19, it was agreed at a general meeting of the corporation, held in Saigon, that Nam Dinh was to be evacuated immediately, removing the European personnel and as much of the company property as possible. The evacuation, which was completed on June 30, was from Nam Dinh to Haiphong, located on the coast of the Gulf of Tonkin.

On June 29, the Washington office of FOA sent a message to the Saigon Mission, notifying it that 1,400 of the bales of cotton purchased by the plaintiff in May had not been shipped and its contracts had been cancelled at a penalty of one cent a pound. The remaining 1,850 bales, the message went on to add, were being diverted at sea, and would be sold at the best price obtainable (finding 12 (a)). This information was conveyed to the plaintiff's Saigon representative soon after its receipt.

The content of messages exchanged on June 29 and June 30, between plaintiff's president, Mr. Benoist, who had offices in Europe during all the time in question, and the company's Saigon representative, revealed a strong desire on the part of Cotonniere that it be paid in Honkong or United States dollars upon the resale of the cotton afloat. However, it was the position of FOA that plaintiff would only be reimbursed in piastres, and the company was so advised (finding 12(c) and (d)).

The method of disposition of the May cotton became a subject of much disagreement. Societe Cotonniere, in its letter of July 12 to the Mission, agreed that sale of the bales afloat would be made by FOA, but insisted that any offer for the purchase of the cotton was to be forwarded to its president for acceptance or rejection. It was stated that Cotonniere would retain the bills of lading on the cotton afloat pending resale of the cotton under terms acceptable to both parties (finding 12(g)).

During this same time the Mission began to express concern over the cotton warehoused at Haiphong. As stated in the Mission's letter of July 12 to the plaintiff:

"Following today's conversation between members of our Mission and Mr. Boesch [the Saigon representative] of your Company, I beg to inform you officially that we are worried about the safety of the stocks of cotton purchased with American Economic Aid funds. These stocks of cotton * * * are provisionally warehoused in Haiphong.

"In view of the increased danger in North Vietnam, permit me to ask you * * * to inform us of the quantity of the stocks of cotton * * * now in North Vietnam as well as the places of storage, so that measures can be taken with a view to immediate removal of these commodities * * * which might be seized by the Communist armed forces."

On the same day this matter was brought to the attention of FOA—Washington. In its message to Washington the Mission suggested that, if Cotonniere on the basis of its legal ownership of the cotton interposed obstacles to its removal, the Government of Vietnam would be requested to seize the cotton. As an alternative measure it was suggested that the Mission be authorized to remove the cotton should the Vietnamese Government be unable to act quickly (finding 14(a)).

On July 15 FOA—Washington replied, stating that "FOA has no right to seize the cotton since possession and title has passed to the private buyer in Vietnam who has paid for same in piasters". Instead, it was recommended that Cotonniere be approached with the suggestion that the original transaction be cancelled and the cotton returned to United States ownership. Such an agreement could be concluded, the reply stated, by loading the cotton for ocean shipment to Keelung, Formosa. Cotonniere would be reim-

bursed for the value of the cotton from counterpart deposits in exchange for ocean bills of lading which indicated Keelung, Formosa, as the destination. Under those circumstances the FOA would agree to assume all costs subsequent to the surrender of the ocean bills of lading. If plaintiff was not agreeable to this proposal, FOA—Washington suggested that the Mission discuss with the Vietnamese Government the advisability of that Government requisitioning the cotton to prevent it from falling into Communist hands. As a final alternative it was stated that, in the event that Cotonniere would not accept arrangements for the cotton to be returned to United States ownership for shipment to Formosa, FOA—Washington would reluctantly agree to shipment of the cotton to Saigon for storage under Cotonniere ownership, covering the cost of transshipment from counterpart funds (finding 14(b)).

Before the above message was received, the Mission on July 15 wrote to plaintiff's Saigon representative as follows:

"* * * (3) With respect to cotton, it is unmistakably clear that after the abandonment of Nam Dinh by the French Union forces, the purpose for which funds were made available originally no longer exists, and stocks of FOA-financed cotton presently located at Haiphong should be returned for disposition in other areas where FOA operates. Payments made in local currency for these stocks will be reimbursed to you. The Mission desires that the cotton stockpiled at Haiphong be shipped to Saigon immediately. Freight charges incidental to this move will be reimbursed.

"(4) In regard to the 3250 bales of cotton * * * of which 1850 bales are afloat * * * the same regulations apply. As per your request of 18 June 1954, 1400 bales have been cancelled before departure from the U.S., and the 1850 bales afloat are being diverted from Vietnam to other countries for which

FOA finances cotton purchases. Bills of lading for these 1850 bales of cotton now in your possession, or in the hands of your bank, should be turned over immediately, endorsed to the Mission in order that they can be forwarded to the place of discharge and utilization * * *. Advance counterpart deposits made by your company will be reimbursed after all charges and losses incidental to the cancellation and disposal are known and accounted for.

* * * * * *

"(6) The Mission feels that under present conditions, the cotton stored at Haiphong does not serve any purpose whatsoever and occupies badly needed storage area in this exceptionally busy port, hence it should be moved from Haiphong to Saigon pending disposition instructions from our Washington office."

On the following day, July 16, plaintiff's Saigon representative sent a message to the company's offices in Haiphong, enclosing a copy of the letter quoted above. In part, the message stated:

"* * * So far as the stock afloat is concerned, and the stock remaining in Haiphong, they [FOA] are adopting the following point of view: The cotton having been bought with the help of the U.S.A. for the purpose of being used for the manufacture of textiles, threads, etc. * * *, but the mills having had to be abandoned, this cotton not being susceptible of being further transformed or converted; first, it should not be permitted to fall in the hands of the communists; second, it should be put in some safe place to be subsequently sold under our auspices or directions; third, according to their letter of the 15th inst. we would be reimbursed in piastres.

* * * * * *

"Even if for the evacuation of our stocks at Haiphong, the FOA were in agreement to obtain for us a permit for exportation, the said stocks

would be sold through their intervention, and we would be reimbursed only in piastres. It is on this point that we have argued with them from the beginning, to obtain from them an agreement to be paid in the currency in which the cotton will be sold. We have, however, unfortunately run into a categoric refusal. * * *"

The next day, July 17, the Mission again wrote the plaintiff's Saigon representative. The letter stated:

"Reference is made to our conversation of this morning regarding the FOA-financed cotton presently located at Haiphong. This is to confirm the fact that the Mission desires to have this cotton removed as soon as possible. If shipping space can be obtained, the cotton should be shipped to the U.S. Operations Mission, Foreign Operations Administration, Keelung, Formosa. If no shipping space for Formosa can be obtained in Haiphong, the cotton should be transshipped to Saigon.

"The Mission has received authorization from the Foreign Operations Administration in Washington to reimburse you for the counterpart deposits and customs duties paid by you for the stocks located at Haiphong and to reimburse you for all charges incidental to the outloading of this cotton from Haiphong. Reimbursement will be made at Saigon in piastres upon the presentation of on board bills of lading covering the cotton located at Haiphong. * * *"

The Mission then sent the following message to FOA—Washington:

"Subject to approval by the Director General at Haiphong, local Cotonniere officials today appeared to have agreed to move the cotton to Keelung from Haiphong, assuming arrangements for shipping can be made, and, if these shipping arrangements cannot be made, to move the cotton to Saigon. * * *"

The plaintiff then directed its efforts toward arranging for shipment of the Haiphong cotton to Formosa, or, if shipping space was unavailable, to Saigon. The Mission assisted in plaintiff's attempt to locate shipping space destined to Formosa (finding 19(a)). However, shipping space at Haiphong was difficult to obtain at that time. Space that was available was controlled by the local military under a system of priorities administered at Haiphong. For a reason not disclosed by the record, plaintiff on or about July 23 began loading its Haiphong cotton, totaling 4,351 bales, for shipment to Saigon. Authority for shipment of the cotton was given by Cotonniere's president, Mr. Benoist.

The movement of the cotton from Haiphong to Saigon required several shipments, extending over a period of approximately two months. As the cotton reached Saigon, provisions were made for its storage by plaintiff's local representative.

On July 23, the day that loading operations at Haiphong began, the plaintiff's president in Paris consulted an American lawyer, Mr. Richard J. Cronan, about the legal rights of the parties in the previously mentioned 1,850 bales of cotton afloat that had been purchased by Cotonniere in May of 1954. On the same day, plaintiff's Saigon representative was instructed by the company's president not to dispose of the bills of lading covering the 1,850 bales until further notice.

Thereafter, Mr. Cronan assumed most of the responsibility for negotiating with FOA on behalf of the Societe Cotonniere. His initial views on the disposition of the cotton afloat were expressed in his letter of July 25 to plaintiff's Saigon representative:

" * * * [W]e have no desire to keep the cotton in any place where it will fall into communist hands. We have not [sic] objection to the cotton, if it is still at sea, being rerouted. But we insist upon being consulted on the question of its sale and if it is sold in some other area

where FOA is operating, we should receive payment in the currency of the area in which it is sold. But this sale, as indicated, should only be . with and upon our consent.

\* \* \* \* \* \*

"It is for this reason that we recommended that you stand on the position taken in our behalf in your letter of the twelfth to the U.S.A. Mission."

Cotonniere's president, Mr. Benoist, affirmed the position taken by Mr. Cronan. Pending a settlement of the 1,850 bales afloat, plaintiff's Saigon representative was instructed by the company's president and Mr. Cronan not to release the cotton shipped from Haiphong.

On July 29 Cotonniere's Saigon representative forwarded ·to the Mission a message he had been instructed to send by Mr. Cronan. Its substance is found in the following language:

"\* \* \* Any cotton stockpiled by us at Haiphong has already been shipped to Saigon for our account and as our property. We see nothing in the agreements between ourselves and you which would justify any change of our position and if any such regulation exists, we would appreciate it if you would bring it to our attention.

"Furthermore, we know of nothing in the relations between ourselves and you which justify your exercising any title to this cotton independently of ourselves. It is for this reason that we cannot think of complying with your request that the bills of lading for the eighteen hundred and fifty (1850) bales of our cotton at sea or enroute be turned over to you. \* \* \*"

Shortly thereafter Cotonniere was notified pursuant to a cable from FOA—Washington that the 1,850 bales afloat had been sold in Formosa and Korea at Cotonniere's price CIF. This disposition was protested by officials of the company. In a letter dated August 4 from plaintiff's Saigon representative to Mr.

Benoist, in which the disposition of the 1,850 bales was brought to the latter's attention, it was stated in reference to the Haiphong cotton:

"\* \* \* FOA would be in agreement to reimburse to us:

a) our price CIF Haiphong
b) transportation cost HG/Saigon
c) custom duties already paid by us

with the exception of bank charges which are as follows:

—on 1840 bales $125.000.—
—on 4651 bales $195.000.—*total bank charges 320.000 $IC*

"Furthermore the FOA does not see the possibility of reimbursing us the cancellation cost of $7.000 U. S. on the 1400 bales."

The terms set forth in the above letter marked the beginning of negotiations between Cotonniere and FOA for the purpose of reaching a comprehensive settlement of the points in dispute between the parties. Negotiations extended over the following six or eight months. While the parties settled their dispute concerning the May cotton (1,400 bales canceled; 1,850 bales diverted), they never reached an agreement as to the Haiphong cotton. At the time of trial that cotton remained in storage in Saigon.

It is the position of plaintiff that the Mission's letter of July 17, 1954, constituted an offer to purchase the Haiphong cotton which was promptly accepted by Cotonniere. The acceptance, argues Cotonniere, was perfected not only by verbal assent, but also by the conduct of the plaintiff. Concluding its argument, plaintiff claims that the position taken by the FOA in discussions, beginning in early August 1954, with Cotonniere's representatives amounted to a repudiation of the contract that had been entered into on or about July 17, a repudiation which excused the plaintiff from further performance under the agreement.

The reason now assigned by plaintiff for the shipment of the cotton from Haiphong to Saigon—that it was·so obligated under a contract allegedly conclud-

ed with FOA on July 17—finds little support in the voluminous record of this case. The motive for plaintiff's action, however, is not easily determined. But it is clear that Cotonniere, having apparently failed in its attempt to use the offices of FOA for the purpose of realizing hard currency, e. g., dollars, for its cotton, treated the offer of July 17 as the beginning point for negotiations. The price terms offered on July 17 were apparently not acceptable to the plaintiff. Circumstances surrounding the shipment of the Haiphong stocks to Saigon, as clarified by the negotiations, point to Cotonniere's unwillingness at that time to close an agreement on FOA's terms.

A threat to Cotonniere's property was posed by the rapid approach in June 1954, of Communist forces from the north. This impending danger caused the company to evacuate personnel and part of its property from the mill at Nam Dinh to Haiphong. The evacuation was completed on June 30, 1954. By that date the bales of cotton we are concerned with were in warehouse storage at Haiphong. The next several days, judging from the record, were consumed in correspondence between Cotonniere and FOA over the May cotton, part of which was at sea. The plaintiff apparently was unconcerned over the Haiphong stocks. It was the Mission, in its letter of July 12, which raised the question of the safety and disposition of this cotton. It was then realized by plaintiff that circumstances might compel it to sell those stocks.

Cotonniere was most anxious to be reimbursed in the currency in which the cotton would be sold. Vietnamese piastres were regarded as being of little or no value, except to the extent they could be converted into francs or, preferably, dollars. The importance which the plaintiff attached to this matter is revealed in correspondence with FOA concerning the disposition of the May cotton.

Thus, in a telegram sent on June 29, 1954, plaintiff's Saigon representative was instructed by the company's president, regarding the undelivered May cotton, to "cover by arbitration * * * and direct cotton loaded at best either Formosa or Manilla if possible stipulate payment Honkong dollars." The reply to this wire on June 30 is significant:

"* * * Our intervention with FOA in order to obtain the necessary funds in US dollars which we would need for * * * arbitration at * * * New York * * * had no success. * * *

"Another long conversation with FOA, with a view to reselling the cotton already loaded, either at Manila or Formosa against payment in HG dollars or even US dollars, has had no result. A formal refusal is made to us as a result of their regulations in force. The cotton will be sold by FOA and we shall be reimbursed in * * * piastres. * * * *"

Again the question was discussed in the letter of July 13, from Cotonniere's Saigon office to its president:

"* * * From the beginning, I have protested * * * against our being reimbursed in piastres, I have set forth * * * the painful and critical situation that events have imposed upon our company, and in view of the losses sustained and still to be sustained * * * I have asked that they explore the possibility of having us benefit by a reimbursement in the currency in which the sale will have taken place. Unfortunately, the FOA rules are against this, and we shall only be reimbursed in piastres. * * * *"

When the subject of the Haiphong cotton was introduced by the Mission into the FOA-Cotonniere discussions, plaintiff suggested a different approach to the disposition of that cotton. Instead of agreeing to a sale of the stocks by FOA, which would lessen any chance Cotonniere might have for reimbursement in hard currency, FOA was questioned as to the possibility of its obtaining for Cotonniere an export license for the Haiphong cotton. The reason for this sug-

gestion was plaintiff's belief that if it were permitted to export the cotton for sale in another area it could obtain payment in hard currency. FOA's answer did not solve the problem. On July 16 the Saigon representative sent a message to plaintiff's Haiphong office, setting forth the position adopted by FOA:

" * * * Even if for the evacuation of our stocks at Haiphong, the FOA were in agreement to obtain for us a permit for exportation, the said stocks would be sold through their intervention, and we would be reimbursed only in piastres. It is on this point that we have argued with them from the beginning, to obtain from them an agreement to be paid in the currency in which the cotton will be sold. We have, however, unfortunately run into a categoric refusal. * * * "

Such was the position of the parties when the offer of July 17 was made to Cotonniere. The FOA considered itself bound by its own regulations to offer payment to plaintiff only in piastres. In all probability, Cotonniere thought it pointless to press any further its demand for hard currency. But the plaintiff did not abandon its search for a bargain. After the offer was extended and on through the formal negotiations beginning in August, Cotonniere continued to test its strength. The question then became, not one of whether plaintiff would be reimbursed in piastres, but, for what items would plaintiff be paid should FOA buy the cotton (finding 31(b)).

Counsel for plaintiff argues that the Mission's cables of July 17 and July 20 directed to FOA—Washington acknowledge Cotonniere's acceptance of the offer of July 17. Those two messages, in relevant part, stated:

"Subject to approval by the Director General at Haiphong, local Cotonniere officials today appeared to have agreed to move the cotton to Keelung from Haiphong * * *. [July 17, 1954.]

"Shipment of stocks to Keelung, Formosa, from Haiphong, if possible, has been agreed to by Cotonniere. * * * [July 20, 1954.]

In calling these two documents to our attention, plaintiff states that in interpreting and applying offers and their acceptance, what the other party is justified as regarding as assent is essential, citing Williston on Contracts, 3rd Ed. § 35; Industrial Products Mfg. Co. v. Jewett Lumber Co., 8 Cir., 1950, 185 F.2d 866, 870. The rule as stated by plaintiff is perhaps more frequently phrased: Mutual assent is an essential prerequisite of the formation of a contract. But the test as to whether there is mutual assent is objective and does not depend upon the undisclosed intentions of the parties. Canister Co. v. National Can Corp., D.C. 1945, 63 F.Supp. 361, 365.

Plaintiff argues that its officials verbally agreed to the July 17 offer of FOA. The above two messages are said to establish this point. We are unable to agree with plaintiff, however, that the messages have the probative weight that is ascribed to them. In the one message it is stated that Cotonniere "appeared to have agreed to move the cotton to Keelung from Haiphong." In the other it is said that shipment of the stocks to Keelung "has been agreed to by Cotonniere". It is conceded that FOA's primary interest was in the safety of the cotton, not the price for which it could be acquired. Even so, we think it significant that no mention was made in the Mission's cables to Washington of the circumstances under which the cotton was being, or about to be, shipped from Haiphong.

Not only is correspondence from the Mission to FOA—Washington silent on this question, but so too are the communiques between Cotonniere's Saigon headquarters and its president, who was residing in Europe. This situation is especially embarrassing to plaintiff's case. Plaintiff's representatives in Haiphong and Saigon did not possess the necessary authority to commit Cotonniere to an agreement such as contemplated in the July 17 offer. Prior authorization from Mr. Benoist, Coton-

niere's president, would have been needed. That authority was obtained for the shipment itself, from Haiphong to Saigon, but the record is free of any contemporaneous evidence that Cotonniere had legally obligated itself to make. the shipment.

Certainly Cotonniere's action in refusing to release the cotton to the Mission for shipment to Formosa was inconsistent with the idea that the company had obligated itself under the July 17 offer. If any notion was entertained by FOA that the cotton was being moved to Saigon in compliance with that offer, it should have been dispelled by a statement made by Cotonniere's Haiphong representative in late July. The statement is referred to in a note placed in the Mission file on July 31, 1954:

"Cadoret states that although about half of the cotton is on the way to Saigon from Haiphong, he cannot give us authority to load it aboard for Keelung until he gets instruction from the head office in Paris. He has orders to move all cotton from Haiphong to Saigon and store it temporarily pending settlement of the 1840 bales afloat. What action do we or can we take now?"

It is these circumstances—not to mention the prolonged settlement negotiations which started in August—which convince us that the July 17 offer was never assented to by plaintiff.

The plaintiff's second basis for recovery is that the Government requisitioned the Haiphong cotton for a public purpose. It is argued that great pressure from FOA caused Cotonniere to remove its cotton from warehouses and begin loading operations in Haiphong. Pressure was exerted and proved effective, it is urged, because of FOA's known power to bring about a seizure of the cotton by the Vietnam Government, and, by reason of its "end-use" control, to impose penalties against Cotonniere for failure to return the cotton to United States ownership.

The elements necessary to prove a compensable "taking" are well-defined. It must first be shown that there was an effective "taking" of the property by the Government. It is not necessary that there be a "taking" in the sense of one being deprived of legal title or physical possession. Substantial interference with the owner's use of the property is sufficient. Turney v. United States, 1953, 115 F.Supp. 457, 126 Ct.Cl. 202; Lord Manufacturing Co. v. United States, 84 F.Supp. 748, 114 Ct.Cl. 199 (1949). Authority to requisition is another element which must be established. United States v. North American Transportation & Trading Co., 1920, 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935.

The record does not indicate that plaintiff's property was interfered with in any way by FOA. While FOA was most anxious that the stocks be removed from the reach of the Communists, it took no measures which, in and of themselves, would accomplish that purpose. Plaintiff's reference to FOA's powers under the "end-use check" provision of the Vietnam-United States economic aid agreement would be relevant only if it could be shown that the use of those powers was threatened. This was not done.

At one point, FOA requested the Vietnam Government to requisition the Haiphong stocks (finding 17). But this proposal was not acted upon by the Vietnam Government. There is no evidence that this request was made known to plaintiff, or used as a threat. If it was, it had no effect upon plaintiff as a threat. Plaintiff's action in sending the Haiphong cotton to Saigon reflected its own choice in the matter.

It is obvious also that officials of FOA had no intention to requisition the Haiphong stocks. Thus in the message of July 15, directed to Cotonniere, it was stated: "The Mission desires that the cotton stockpiled at Haiphong be shipped to Saigon immediately." In the offer of July 17 it was said that the Mission "de-

sires to have this cotton removed [from Haiphong] as soon as possible." The language used, framed as a "request" rather than a "demand", is indicative of the position that had been taken by FOA when loading operations began at Haiphong. In short, none of the officers of FOA ever intended to requisition the Haiphong cotton in the name of FOA or any other agency or instrumentality of the United States.

Nor was FOA authorized to effect such a requisitioning. FOA—Washington's message of July 15 to the Mission settled that point:

"* * * FOA has no right to seize the cotton since possession and title has passed to the private buyer in Vietnam who has paid for same in piasters. Only entity with power of seizure would be Government of Vietnam. * * * "

For the above reasons, the plaintiff's petition will be dismissed.

It is so ordered.

FAHY, Circuit Judge, sitting by designation, and LARAMORE and MADDEN, Judges, concur.

WHITAKER, Judge, took no part in the consideration and decision of this case.